**Kenneth GOBEN, Appellant**

v.

**COMMONWEALTH of Kentucky, Appellee**

**2014–SC–000712–MR**

Supreme Court of Kentucky.

DECEMBER 15, 2016

COUNSEL FOR APPELLANT: V. Gene Lewter, Assistant Public Defender, Department of Public Advocacy

COUNSEL FOR APPELLEE: Andy Beshear, Attorney General of Kentucky, Todd Dryden Ferguson, Assistant Attorney General, Office of the Attorney General

## OPINION OF THE COURT BY JUSTICE HUGHES

Kenneth Wayne Goben appeals as a matter of right from a Judgment of the Jefferson Circuit Court convicting him of manufacturing methamphetamine (Kentucky Revised Statute (KRS) 218A.1432) and first-degree trafficking in a controlled substance (methamphetamine) (KRS 218A.1412). Having also found Goben to be a first-degree persistent felony offender (PFO) (KRS 532.080), the jury recommended and the Circuit Court imposed PFO-enhanced sentences of life in prison for the manufacturing offense and twenty years in prison for the trafficking offense.[1] With respect to the manufacturing charge, the Commonwealth alleged that in the course of searching Goben's apartment and his separate storage locker, police officers found 3.6 grams of methamphetamine along with various chemicals and equipment used in the making of that drug. With respect to the trafficking charge, the Commonwealth alleged that other items found in Goben's apartment and locker—small, zip-lock plastic bags; digital scales; drug-ledger notes; five small, zip-locked baggies with methamphetamine ready for individual sale and two rifles—all implied that Goben possessed the drug with the intent to sell it.

Goben alleges violations of his constitutional rights to a speedy trial and to freedom from unreasonable searches and seizures. He also contends that the guilt phase of his trial was rendered unfair by the admission of so-called investigative hearsay and by the admission of irrelevant and inflammatory firearm evidence. He maintains that the penalty phase of his trial was tainted by the admission of evidence of a prior conviction that was not yet final. Finally, he complains that the trial court's Judgment incorrectly provides that his life and twenty-year sentences are to be served consecutively. Taking these contentions in reverse order, we agree that the Judgment must be amended to clarify that Goben's life sentence is to be served

---

1. Goben was also convicted of illegal possession of marijuana (KRS 218A.1422) and illegal possession of drug paraphernalia (KRS 218A.500), misdemeanors the sentence for which—an agreed-to 180 days—is to be served concurrently with the felony sentences.

concurrently with his twenty-year sentence. We agree that hearsay, firearm, and prior-conviction evidence was, or at least may have been, improperly admitted, but conclude these actual or potential errors, one of which was not preserved and one essentially waived, did not bear significantly on the outcome of the trial or on its fundamental fairness and so do not entitle Goben to relief. And despite concern that it took five years to bring Goben to trial and that the police officers initially entered Goben's apartment without a warrant, our careful review of the record convinces us that both the delay and the warrantless entry were justified and did not violate Goben's rights. Accordingly, we affirm the Judgment of the Jefferson Circuit Court.

## RELEVANT FACTS

Because Goben's principal claims concern the time required to bring him to trial and the trial court's pretrial denial of his motion to suppress the evidence seized from his apartment and his storage locker, our initial summary of the case's procedural history and of the evidence adduced at trial will provide a general background for Goben's main claims. We then address facts relevant to each of his claims in more specific detail below.

According to their testimonies at trial, at about 12:30 a.m. on August 16, 2009, then Louisville–Metro Police Department (LMPD) Officers Joe Heitzman, Tim Stokes,[2] and Greg Satterly, all in separate vehicles, received a radio report of a possible stabbing in the parking lot of an apartment complex in the 3800 block of Freedom Way in the Okolona area of Louisville. All three officers responded to the dispatch with Heitzman the first to arrive at the scene.

Heitzman testified that his initial impression was that no one was in the apartment complex's poorly lit parking lot, but that soon after he exited his vehicle and began walking through the lot he found a man partly lying on the ground, partly leaning against a pickup truck and covered in blood. Heitzman immediately summoned EMS, and then examined the man to see if he was breathing or in need of immediate first aid. The man appeared to be breathing and conscious, but when Heitzman asked him who he was and what had happened, the man did not respond. Heitzman testified that at that point—he had not been there for more than two minutes— Officer Stokes arrived. Heitzman urged Stokes to try to find out from the injured man what had happened, while he followed a trail of blood spatters, some of which were several inches in circumference, through the parking lot to the base of a stairway leading to the apartment complex's second level. Heitzman identified photographs of what appear to be patches of a dark liquid on pavement amid parked cars as depicting the trail of blood he encountered in the parking lot that morning.

Heitzman testified that he continued to follow the blood trail up the stairway and that on the stairway he observed what seemed to him a trail of a different sort. This was a stairway of riserless treads, and wedged in between two treads a few stairs up from ground level Heitzman saw an athletic shoe. Lying on a stair a few steps above the shoe was the detached leg of a wooden chair. Above the chair leg dangling from the stair's hand railing, Heitzman saw what he thought was a necklace. Above that, and a few steps above the chair leg, on the landing of the second level, he saw a garment that ap-

---

**2.** By the time of trial, in September 2014, Heitzman and Stokes had become detective sergeants and instructors for the police department.

peared to be a sweatshirt or a jogging suit. A couple of doors on from the landing and the jogging suit, on the second level walkway, Heitzman saw lying on the ground a beverage cup, apparently from a convenience store. On the ground near the mouth of the cup was a spattering of dark spots—possibly spilled beverage or possibly more blood. Again, Heitzman identified photographs of the items that he characterized as a "debris trail," which seemed to end, Heitzman testified, at the open door of apartment number 18. A light was on inside the apartment, but there was no response when Heitzman called in asking if anyone was there.

During cross-examination, Heitzman admitted that the photographs of the stairway and second-level walkway showed nothing like the volume of blood spatters present in the parking lot. He testified, however, that the debris trail suggested the possibility of additional violence and that the open apartment door at that hour was, at that apartment complex (which was within Heitzman's usual beat), highly unusual and suggestive that something was amiss.

Meanwhile, according to the testimony of Officer Stokes, he too had been unable to elicit any information from the injured person, and so, when Officer Satterly arrived at the scene not far behind Officer Stokes, Stokes asked him to stay with the victim until EMS arrived, while he, Stokes, joined Heitzman following the blood trail through the parking lot and the debris trail up the stairs to apartment 18. There he and Heitzman conferred briefly and decided to enter the apartment to look for additional victims or possibly the perpetrator(s) of the assault on the person in the parking lot. Both officers testified that during their brief sweep of the apartment they did not come upon any additional persons, but they did observe in plain view what they believed to be illegal drugs and drug paraphernalia.[3]

The detective assigned to lead the investigation of the case, Detective John White, testified that on the basis of those plain-view observations, which Heitzman and Stokes reported to him, he applied for and obtained a warrant to search the apartment. The ensuing search, as noted, uncovered evidence of methamphetamine production. At that point, narcotics Detective Steve Healy, one of LMPD's two certified site safety officers, and Matthew Vanderpool, a member of the Jefferson County Health Department's Hazardous Materials Team, were called in, respectively, to collect the methamphetamine evidence and to determine whether the apartment had been contaminated by methamphetamine.

Healy testified that in addition to a so-called one-pot methamphetamine "lab"[4] and numerous chemicals and pieces of equipment used in making methamphetamine, his investigation revealed that Go-

3. According to the search warrant affidavit, the officers observed various items on an open shelf in a room that appeared to serve as an office. Those items included numerous small baggies, pipes (for smoking), rolling papers, filters and scales. On the top of the bedroom dressers they saw marijuana, aluminum foil, and straws.

4. According to Healy, who testified as a methamphetamine and drug trafficking expert, the "one pot" method of making methamphetamine is a version of the process whereby ephedrine or pseudoephedrine is converted to methamphetamine by means of anhydrous ammonia and lithium. The one-pot method is significantly faster than some other versions of that process (one to one-and-a-half hours as opposed to six to eight hours) because several of the reactionary steps are made to occur in rapid succession in a single reactionary vessel or "pot." Investigators frequently refer to these vessels—often two-liter plastic soda bottles—as "labs" or "clandestine labs."

ben leased a storage locker. Based on the drug evidence found in the apartment, Healy obtained a warrant later that same day to search the storage locker. There he found an empty box of Sudafed tablets (a source of the methamphetamine precursor pseudoephedrine); a large Pyrex flask with valves; two 22 caliber rifles; and ammunition for the rifles. All of these items, rifles included, were shown to the jury and admitted into evidence.

Vanderpool testified that he performed a "meth-check," a sort of methamphetamine residue test,[5] on cabinets above the stove in the apartment's kitchen. The result of the test was positive, indicating the presence there of methamphetamine.

Not surprisingly, the apartment, with its door left open at that unusual hour, turned out to be occupied by the stabbing victim in the parking lot. That victim, who refused initially to identify himself or explain what had happened turned out to be Kenneth Goben, the defendant.

Five days later, on August 21, 2009, Detective White filed a criminal complaint against Goben in the Jefferson District Court, charging him with manufacturing methamphetamine; trafficking in a controlled substance, methamphetamine (second offense); and possession of marijuana. The record before us does not make clear the course of district court proceedings, nor does it make clear the course of Goben's treatment for and recovery from his stab wounds, but it does show that the matter was referred to the Jefferson County Grand Jury, which, on December 10, 2009, indicted Goben for those same three offenses.

Ironically, the night before the issuance of that indictment (09–CR–3648), Decem-

ber 9, 2009, Detective Healy, acting on an anonymous tip, caught Goben yet again manufacturing methamphetamine in a "one pot lab." The upshot of that was another indictment, this one issued by the Jefferson County Grand Jury on January 21, 2010, whereby Goben (along with an accomplice) was again charged with manufacturing and trafficking in methamphetamine. That indictment (10–CR–0178), appears to have issued immediately after the same grand jury issued a second indictment against Goben with respect to the events of August 16 and the search of Goben's storage locker. Indictment 10–CR–0177 charged Goben with two counts of being a convicted felon in possession of a firearm—one count for each of the rifles found in Goben's locker—and with illegal use or possession of drug paraphernalia, the Pyrex flask. The December indictment was assigned to Division 9 of the Jefferson Circuit Court, with Judge McDonald–Burkman presiding, and initially both January indictments were assigned to Judge McDonald–Burkman as well.

Plea negotiations ensued, with the Commonwealth eventually offering to settle all of the charges in exchange for Goben's guilty plea and acceptance of a twenty-year sentence. Goben's rejection of that offer led to the withdrawal, in May 2010, of his retained counsel. That attorney, Tim Denison, in addition to his motion to withdraw, also filed motions for bond reduction and for a speedy trial. Denison was replaced by an attorney, John Mack, from the Louisville Metro Public Defender's Office. Mack filed a motion in July 2010 to compel discovery in the August 2009 cases (indictments 09–CR–3648 and 10–CR–0177), and moved orally to have the Com-

---

5. Not to be confused with a check, often referred to as a "meth check," of the National Precursor Log Exchange System, a system that keeps track of pseudoephedrine pur-

chases and purchasers, See *Bauer v. Commonwealth*, 2014 WL 4113110 (Ky. 2014) (describing the NPLex system).

monwealth elect which indictment it would try first. The Commonwealth agreed to provide the requested discovery and to make its election by August 27, 2010. The Commonwealth chose to try the December 2009 incident first (indictment 10–CR–0178), and in September 2010 Judge Mc-Donald–Burkman heard and denied Goben's motion to suppress evidence in that case.

Promptly thereafter, it appears, Goben objected to the fact that both he and his codefendant in the December 2009 case were represented by attorneys from the same Public Defender's office, with the result that Mack was allowed to withdraw from his representation of Goben. Mack was followed by a series of attorneys, "conflict counsel," from the Assigned Counsel Panel Plan,[6] who entered appearances on behalf of Goben but promptly moved to withdraw.

At some point during this search for representation, in about mid-2011, the trial of indictment 10–CR–0178, the indictment related to the December 2009 drug charges, was reassigned from division 9 of the Jefferson Circuit Court to division 8. Because the Commonwealth elected to try that indictment first, as long as the "division 8"[7] proceedings remained pending, the proceedings with respect to Goben's two indictments in division 9 were effectively abated.

As noted in our review of Goben's "division 8" conviction, *see Goben v. Commonwealth*, 2015 WL 4967251 (Ky. 2015), the Public Defender's office continued to have problems finding representation for Goben until sometime prior to mid-November 2012 (Goben says it was August 2012), when James Douglas Mory entered his appearance on Goben's behalf. With Mory's appearance the parties again sought to negotiate a plea agreement, but ultimately those efforts came to naught. Goben was tried for the December 2009 offenses in October 2013, was found guilty of manufacturing methamphetamine and trafficking in it, and was sentenced as a first-degree persistent felon to a total of thirty years' imprisonment. *Goben* at *1.

With the conclusion of the "division 8" proceedings, the proceedings in division 9 resumed. Reminiscent of the matter's beginning in early 2010, they resumed with Goben's rejection of a plea offer (ten-year sentences on each of the two pending indictments at twenty-percent parole eligibility), followed by attorney Mory's December 2013 motion to withdraw. At the same time, Mory also moved to renew attorney Mack's July 2010 discovery motion (a motion the court had granted in December 2010), requesting in particular any 911 re-

6. The Assigned Counsel Panel, is simply a list, maintained by the Louisville Metro Public Defender's Office, of private attorneys who are willing, their own schedules and caseloads permitting, to represent for a reduced fee indigent criminal defendants who, for one reason or another, usually a conflict such as the one in this case, the Public Defender's Office is not able to represent. Although the Plan and its workings are matters within the sole discretion of the Public Defender's Office, it appears that when a conflict arises the court in which the matter is pending apprises the Public Defender of that fact, and the Public Defender then assigns the case to one of its Assigned Counsel Panel members. The member either accepts the representation or moves to withdraw. If he or she withdraws, the court makes another request, and the process continues until the case lands with an attorney who is able and willing to provide the representation.

7. The quotation marks are necessary because for reasons not apparent in the record of that indictment, the case assigned to division 8 was ultimately tried in division 6. *Goben v. Commonwealth*, 2015 WL 4967251 at *1 (Ky. 2015).

cordings relating to the August 16, 2009 incident at Goben's apartment complex; witness statements regarding that incident; and the search warrant materials, particularly the affidavit in support of the warrant request for the search of Goben's apartment. By this point the Commonwealth was on its third attorney in the prosecution of the matter, and while Commonwealth's Attorney John Balenovich thought it likely that the requested items had already been provided, he agreed (as the court insisted) to provide them again. He did so as of February 14, 2014.

New counsel, Robert Florio, was appointed for Goben in February 2014. He entered his appearance in April, it appears, and at a pretrial status conference on May 12, 2014, he moved to suppress all the evidence seized by the police in the August 16, 2009 search of Goben's apartment and the subsequent search of his storage locker. At that same May 12 pretrial conference, the Commonwealth acknowledged that Goben had moved *pro se* in February for a speedy trial pursuant to KRS 500.110. That statute permits an incarcerated person subject to a detainer to request a trial of the matter giving rise to the detainer within 180 days of the request. With that request in mind, the court scheduled the suppression hearing for May 29, 2014, and trial for June 3, 2014.

The suppression hearing took place as scheduled. At the outset, the Commonwealth explained that it understood Goben to be challenging neither the warrant application nor the warrant, but rather the warrantless entry of the apartment by Officers Heitzman and Stokes, whose plain-view observations inside Goben's apartment supplied the main support for the warrant application. Defense counsel agreed that the warrantless entry was the focus of Goben's motion, although he asserted that if that entry were deemed unlawful, then the subsequent searches and seizures based on it would be unlawful as well.[8]

With that understanding of the issue before the court, Detective White, the lead detective on the case and the officer who had applied for the warrant to search the apartment, testified, with the aid of photographs from the scene, that he arrived at the apartment complex not long after EMS had taken Goben to the hospital. Officers Heitzman and Stokes had described to him Goben's condition and his refusal to tell them anything about what had happened; had shown him where in the parking lot Goben had been found; had shown him the blood and debris trails between there and apartment 18—and he agreed that those were trails; had de-

8. Counsel's framing of and limiting of the suppression issue was thus at odds with, and in effect a disavowal of, a *pro se* motion to suppress that Goben presented to the court shortly before the hearing. In his *pro se* motion, Goben asserted that officers Heitzman and Stokes misrepresented the circumstances—they knew, for example, according to Goben, that the perpetrator of the assault on Goben had fled the scene and was not hiding in the apartment—to suggest an exigency they were aware did not exist. He asserted further that items the officers claimed to have seen in plain view had not been in plain view. In addition to challenging the reasonableness of the warrantless entry to his apartment, in other words, Goben sought to challenge the validity of a warrant he claimed was based on a false affidavit. The disconnect between Goben's would-be approach to the suppression issue and the approach counsel actually pursued provided grist for a series of *pro se* motions to reconsider suppression that Goben filed throughout the remainder of the case, up to and including a *Brady* [v. *Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963)] motion counsel presented to the court on Goben's behalf at sentencing. To the extent that these motions inform or shed light on the issues before us, we make note of them below.

scribed apartment 18's lights-on-door-open state; and had explained that in those circumstances the possibility of another victim in the apartment seemed likely enough to them to require that they check. Detective White agreed. Convinced that the officers' brief entry to look for additional victims was legitimate, Detective White also believed their plain view observations were legally sound. Based on those observations, and with Officer Stokes's assistance, Detective White then promptly applied for a warrant.

On cross-examination, Detective White conceded that there was not much evidence of blood on the stairs or on the second floor walkway, although he would not discount the possibility that droplets by the cup on the walkway just outside apartment 18 were blood. However, he thought the debris trail, in conjunction with the violence that had clearly occurred in the parking lot, was suggestive enough of violence leading to or from the open apartment to make a check of the apartment reasonable.

Goben argued to the court that his injuries were sustained in the parking lot, that they had no connection to his apartment, and that the purported "debris trail" was non-existent. In his view, random debris is to be expected at a poorly maintained apartment building, and the officers were exploiting a common circumstance as a pretext for their unlawful entry into his apartment.

Rejecting that argument and denying Goben's motion to suppress, the trial court explained that the totality of circumstances—the violence implicit in the type and seriousness of Goben's injuries and the blood in the parking lot, his refusal to speak to the officers, the possible debris trail linking the parking lot violence to the apartment, and an apartment door inexplicably left open—created both probable cause to believe that there might be other victims inside the apartment and, concomitantly, an exigent need to find out. The court ruled the officers' entry in response to that exigency was reasonable, and so there was no violation of Goben's Fourth Amendment rights.

As noted, trial was scheduled for June 3, 2014, just a few days after the suppression hearing. When court convened that morning, and while the prospective jurors were still waiting outside the courtroom, Goben moved for a continuance. An understanding of his motion requires a brief look at one aspect of the Commonwealth's case.

As part of his investigation into Goben's alleged manufacture of methamphetamine, Detective Healy interviewed Goben's girlfriend, Cindy Tilford, and Tilford's friend, Robin Taylor. Each woman admitted to Healy that at Goben's request and in return for his promise to pay $100 per box, she had purchased pseudoephedrine-containing cold medicine (such as Sudafed) and transferred it to Goben. The detective's check of the National Precursor Log Exchange System, *see* note 5 *supra*, confirmed that the women had made pseudoephedrine purchases at the pertinent time.

Tilford had apparently managed to avoid the Commonwealth's subpoena, but as part of the Commonwealth's manufacturing case against Goben, the prosecutor expected Taylor to testify that she had supplied Goben with the methamphetamine precursor. The night before trial, the prosecutor telephoned Taylor to remind her of trial the next day and to confirm the gist of her testimony. She told him then, for the first time, that although Goben had promised to pay her $100 per box of cold medicine, he had failed to pay her and had explained that he could not pay because he had not yet sold the methamphetamine. The prosecutor promptly, by text message, apprised

Goben's counsel of this new statement attributed to Goben, a statement the prosecutor deemed inculpatory with respect to the trafficking charge as well as the charge of manufacturing.

In court the next morning, however, Goben insisted that Taylor's statement had exculpatory potential—evidence of no sale—and he requested a continuance to explore that potential and in general to reassess the defense in light of this new revelation. Objecting, the Commonwealth insisted that the new statement was inculpatory, not exculpatory, but to allow the trial to go forward as scheduled it would instruct Taylor to make no reference to it. The court tended to agree with the Commonwealth that the statement's exculpatory potential was marginal, at best, but wanting to assure Goben received the fairest possible trial, it granted his motion and continued the matter until July 15, 2014, a date still within the ostensible 180-day speedy trial limit.

On July 15 the court again convened for trial, and this time got as far as assembling the panel of prospective jurors and reading to the panel the indictment wherein Goben was charged with trafficking in a controlled substance—subsequent offense. The subsequent offense portion of the charge was pertinent only to sentencing and thus was to be excluded from the initial guilt phase of trial. *Wallace v. Commonwealth*, 478 S.W.3d 291, 303 (Ky. 2015) (citing *Peyton v. Commonwealth*, 931 S.W.2d 451, 455 (Ky. 1996), for the proposition that prior trafficking offenses are not to be introduced during the guilt phase of a current trafficking offense). Unfortu-

nately, when the court read the indictment's trafficking count, it made the easy mistake of continuing to read past the current (August 16, 2009) charge and informed the jury panel that "[f]urther, the defendant has previously been convicted of Trafficking in a Controlled Substance in the First Degree."

At that point the Commonwealth asked to approach the bench and called the court's attention to the mistake. By then, however, as the court readily and apologetically acknowledged, the cat was out of the bag. The panel had been tainted—"poisoned" as the court put it—and there was no way to ensure that another panel assembled from the same jury pool would not in some way be exposed to the taint. The court explained to the potential jurors what had happened, dismissed them back to the jury pool, and rescheduled Goben's trial for September 16, 2014, when a new jury pool would be in place.

Prior to that date, on September 4, 2014, Goben, claiming that the 180-day speedy trial deadline expired on August 19, 2014, moved *pro se* for the dismissal of all pending indictments. The trial court did not rule on the *pro se* motion, at least not explicitly, and counsel did not raise the issue. Instead, the third attempt to try the August 2009 manufacturing and trafficking charges succeeded.[9] In a trial that lasted three days, from September 16, 2014 to September 18, 2014, Goben was found guilty of those offenses, as noted above, and was sentenced as a first-degree persistent felon to life in prison.[10]

9. The trial court severed for separate trial indictment 10–CR–0177's two counts of firearm possession by a convicted felon, but joined for trial on September 16, 2014 that indictment's possession of paraphernalia count with the manufacturing, trafficking, and possession of marijuana counts of indict-

ment 09–CR–3648. The Commonwealth ultimately dismissed the firearm charges.

10. Goben was arraigned on the PFO indictment, 14–CR–1059, just prior to the suppression hearing on May 28, 2014.

Having thus sketched in the background of Goben's claims, we turn now to a more particularized consideration of their merits. We begin, as Goben does, with the contention that delays in bringing him to trial, both the nearly five-year delay between indictment and trial, and the more than 180–day delay following his *pro se* KRS 500.110 speedy-trial motion, violated Goben's constitutional and statutory rights to a prompt disposition of the charges against him.

## ANALYSIS

### I. Goben Was Not Denied His Constitutional Right to a Speedy Trial.

 As Goben correctly notes, both the Sixth Amendment to the United States Constitution and Section 11 of our Kentucky Constitution guarantee him a speedy trial.[11] Discussing the federal right in *Barker v. Wingo*, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972), the Supreme Court noted that criminal trials can be delayed for myriad reasons, both good and bad, at the behest, or by virtue of the actions, of either side. As a result, alleged violations of the speedy-trial right require a "functional analysis of the right in the particular context," 407 U.S. at 522, 92 S.Ct. 2182, a case-by-case "balancing test, in which the conduct of both the prosecution and the defendant are weighed." *Id.* at 530, 92 S.Ct. 2182. The *Barker* Court set out four factors—"[l]ength of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant"—as particularly pertinent to the balancing test. *Id.* In a subsequent case, the Supreme Court characterized the relevant enquiries as "whether delay before trial was uncommonly long, whether the government or the criminal defendant is more to blame for that delay, whether, in due course, the defendant asserted his right to a speedy trial, and whether he suffered prejudice as the delay's result." *Doggett v. United States*, 505 U.S. 647, 651, 112 S.Ct. 2686, 120 L.Ed.2d 520 (1992).

Our predecessor Court early on adopted the *Barker* analysis as appropriate for the purposes of Section 11 as well as the Sixth Amendment, *Johnson v. Commonwealth*, 514 S.W.2d 115 (Ky. 1974), and since then we have continued to analyze a defendant's speedy-trial rights under both constitutions by applying the four-factor *Barker* analysis as applied by the Supreme Court. *Dunaway v. Commonwealth*, 60 S.W.3d 563, 569 (Ky. 2001) (noting that "[w]e analyze a defendant's constitutional rights to a speedy trial, under both the Federal and Kentucky constitutional provisions, by applying the four-factor *Barker* test"); *Stacy v. Commonwealth*, 396 S.W.3d 787, 795 (Ky. 2013) (same).

 The *Barker* analysis requires a reviewing court to apply constitutional standards to the facts of the case. As in other contexts involving mixed questions of constitutional law and fact, where the question is properly preserved, *i.e.*, where the trial court is actually asked to rule on the timeliness of the trial, we employ a dual standard of review: *de novo* for legal questions and clear error for questions of fact. *United States v. Young*, 657 F.3d 408, 413–14 (6th Cir. 2011) (applying dual standard to speedy-trial claim); *cf. Ornelas v. United States*, 517 U.S. 690, 699, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996) (applying *de novo* review to questions of reasonable suspicion

11. The Sixth Amendment provides in pertinent part that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial." Section 11 of the Kentucky Constitution provides in part that "in prosecutions by indictment or information, he [the accused] shall have a speedy public trial by an impartial jury of the vicinage."

and probable cause in Fourth Amendment context, while noting that findings of historical fact are to be reviewed only for clear error); *Fugett v. Commonwealth,* 250 S.W.3d 604, 616 (Ky. 2008) (applying dual standard of review to denial of Fifth–Amendment based suppression motion).

In many speedy-trial cases, this one included, the defendant moves for a speedy trial at the outset of proceedings or at some other point prior to trial, without claiming that the speedy trial clock has expired, but rather that he is entitled to be tried without undue delay. The *pro forma* speedy-trial motion filed in May 2010, by Goben's then withdrawing counsel did not suggest that the court had erred, was about to err, or that Goben's rights had in any way been violated. It did not seek any remedy or ruling, something an appellate court could review. It merely asserted, with an eye, toward one of the *Barker* factors, that Goben wished to be tried in a constitutionally timely way. By contrast, Goben's *pro se* motion in September 2014 did assert an error—the delay of trial beyond the 180–day limit imposed by KRS 500.110—and sought the remedy of dismissal of the case. This type of speedy trial motion, when properly entered, generally results in a trial-court ruling subject to review on appeal.

Goben maintains that despite the lack of a trial court ruling which this Court could review, his constitutional speedy-trial claim was *preserved,* not merely that his right was asserted in the May 2010 motion. Typically, we have accepted such assertions of the right as preserving post-trial claims that the right was violated, even though the trial court was never asked to address such a claim. *See, e.g., Stacy,* 396 S.W.3d at 795; *but cf.* Gregory P. N. Joseph, SPEEDY TRIAL RIGHTS IN APPLICATION, 48 Fordham L. Rev. 611, 620 (1980) ("A defendant's claim that any of his speedy trial rights

has been denied customarily must be brought before the trial court on a motion to dismiss or quash the indictment or information, as appropriate, pursuant to local procedural rules."). In the absence of a trial-court ruling on issues, generally our review is for palpable error. But given our usual practice with speedy trial motions and the parties' apparent reliance on that practice, we proceed here as if the asserted error were preserved, resolving factual ambiguities, if any, in favor of the trial court's Judgment.

■ We turn to the *Barker* balancing test and its first factor, the length of delay. For constitutional purposes, the speedy trial clock begins to run at the earlier of the defendant's arrest or his indictment and continues until conviction, upon either trial or guilty plea. *Betterman v. Montana,* —— U.S. ——, 136 S.Ct. 1609, 1613, 194 L.Ed.2d 723 (2016) ("The constitutional right [the speedy-trial right] . . . does not attach until . . . a defendant is arrested or formally accused. . . . Today we hold that the right detaches upon conviction.") (citation omitted). In this case, it appears that Goben was "arrested" soon after the police found the meth lab in his apartment on August 16, 2009, and then Detective White filed a criminal complaint against him on August 21. But because Goben needed medical treatment for his serious stab injuries, it appears that he was not then taken into custody. In any event, he was at large on December 9, 2009, the day before his indictment on the August offenses, when he was once again caught manufacturing methamphetamine. There was a delay then of approximately five years, give or take a month or two, from either Goben's presumed arrest in late August 2009 or his December 2009 indictment until his conviction at the end of trial on September 18, 2014.

■ Criminal trials take time, however promptly dispatched, and accordingly the Supreme Court has observed that a defendant has not been denied a "speedy" trial if the government "has, in fact, prosecuted his case with customary promptness." *Doggett*, 505 U.S. at 652, 112 S.Ct. 2686. Customary promptness will depend to some extent on the seriousness of the charges and the complexity of the evidence, but absent substantial complications, courts have found post-accusation delay "presumptively prejudicial," for speedy-trial purposes, "as it approaches one year." *Doggett*, 505 U.S. at 652 n. 1, 112 S.Ct. 2686. "Presumptive prejudice" does not entitle the defendant to relief, but it does require that the delay be further analyzed under *Barker* to determine whether relief is in order. *Doggett*, 505 U.S. at 651–52, 112 S.Ct. 2686.

Aside from the suppression issue discussed below, Goben's case was serious (especially in light of Goben's PFO status), but it was anything but complicated—the police found compelling evidence of meth making and manufacturing in Goben's apartment. The five-year post-accusation delay, then, easily qualifies as presumptively prejudicial, and so requires us to inquire further as to who was responsible for the delay—Goben, the Commonwealth or, as is often the case, both.

Goben overlooks the fact that the main reason trial of his August 2009 charges was delayed was the Commonwealth's election to try his December 2009 charges first.[12] As noted above, once that choice was made, proceedings on the August

charges were held in abeyance until late October 2013, when the December 2009 charges also resulted in Goben's conviction of manufacturing and trafficking in methamphetamine.

■ When a delay such as this one is attributable to the government, a reviewing court must distinguish among deliberate, bad faith delays meant to hamper the defense; delays that result from negligence or other neutral reasons, such as overcrowded courts; and delays for valid reasons, such as a missing witness. *Barker*, 407 U.S. at 531, 92 S.Ct. 2182. The first, not surprisingly, weigh heavily against the state in the speedy-trial balancing test. The second also count against the state since "the ultimate responsibility for such circumstances must rest with the government rather than with the defendant," *id.* but such neutral are not viewed as dimly by the court. Finally, the last—delays for "valid reason[s]"—do not offend the Constitution and "should serve to justify appropriate delay." *Id.* Goben's other prosecution for manufacturing and trafficking in methamphetamine was a valid reason to delay this one.

■ As Justice Brennen noted in his concurrence in *Dickey v. Florida*, 398 U.S. 30, 52, 90 S.Ct. 1564, 26 L.Ed.2d 26 (1970), a *pre-Barker* decision, "perhaps the most important reason for the delay of one criminal prosecution is to permit the prosecution of other criminal cases that have been in process longer than the case delayed."[13] Absent some reason to think the first prosecution was unduly delayed, completion of

12. We acknowledge that when Goben filed his initial brief our Opinion upholding his conviction in the December 2009 case had not yet been rendered. That case also included a speedy trial issue.

13. Here, the Commonwealth elected to try the "younger" case first, but the not-quite-five-

month age difference is not so great as to make that choice suspect for speedy-trial purposes. As noted, "process" in the "older" case had hardly gotten started and Goben was not incarcerated until after he had committed the second batch of offenses.

a prior prosecution is generally deemed a valid reason to defer a subsequent one. *See, e.g., United States v. Ellis,* 622 F.3d 784 (7th Cir. 2010) (holding that thirty-two month delay in trial of second case to permit completion of trial in first did not violate speedy trial guarantee); *United States v. Watford,* 468 F.3d 891, 903 (6th Cir. 2006) (holding that completion of state trial justified fifty-month delay in federal prosecution); *State v. Bleau,* 668 A.2d 642, 645 (R.I. 1995) (noting that "trial on other charges ... should not be weighed against the state when assessing the reasons for the delay") (citation and internal quotation marks omitted); *Cerf v. State,* 366 S.W.3d 778, 788 (Tex. App. 2012) (quoting *Easley v. State,* 564 S.W.2d 742, 745 (Tex. Crim. App. 1978) "[P]rosecut[ion] on other charges constitutes a valid reason for the delay in bringing [present charges] to trial."). *And see, Smith v. Commonwealth,* 734 S.W.2d 437 (Ky. 1987) (holding that two-and-a-half year delay in bringing murder case to trial was justified in part by the time required to try an escape charge). Prosecution of the December 2009 charges thus provided a valid reason to abate the prosecution of the August 2009 charges until October 2013, when Goben was brought to trial and convicted in the December 2009 case.

The December 2009 charges thus resolved, prosecution of the August 2009 charges resumed, and those charges came to trial less than a year later, in September 2014, with by far the lion's share of that delay attributable either to Goben or to valid reasons. In particular, from October until December, 2013 the parties sought to negotiate a plea. When plea negotiations broke down, Goben's counsel—Mory, the conflict counsel who had tried the December 2009 case—was permitted to withdraw. New conflict counsel was appointed by mid-February, giving him time to prepare for the suppression hearing at the end of May. Trial was scheduled to begin in early June. The Commonwealth's eve of trial discovery and divulgence of what it believed to be new inculpating evidence led Goben to request and the trial court to grant a continuance until mid-July. At the outset of the July proceedings, the trial court unfortunately revealed to the jury panel that Goben had been previously convicted of a similar crime. To ensure no prejudicial repercussions, the trial court continued the trial until September, when there would be a new jury pool. The case was then tried as scheduled in September.

In this entire sequence, the only delays possibly weighing against the government were the two-month delay from attorney Mory's withdrawal in mid-December until attorney Florio's appointment in mid-February, a period during which Goben was without counsel, and the two-month delay from mid-July to mid-September occasioned by the trial court's misreading of the indictment at the outset of the July attempt at trial. As we explain below, since counsel was replaced with "dispatch," the relatively brief gap in Goben's representation at the beginning of 2014 is not to be attributed to the government.

The trial court's July mistake, however, could be deemed negligent. In *Doggett* (which addressed a prosecution delayed some six years by government neglect) the Supreme Court discussed negligent post-accusation delays of trial as follows:

> Between diligent prosecution and bad-faith delay, official negligence in bringing an accused to trial occupies the middle ground. While not compelling relief in every case where bad-faith delay would make relief virtually automatic, neither is negligence automatically tolerable simply because the accused cannot demonstrate exactly how it has preju-

diced him ...... *Barker* made it clear that "different weights [are to be] assigned to different reasons" for delay.... Although negligence is obviously to be weighed more lightly than a deliberate intent to harm the accused's defense, it still falls on the wrong side of the divide between acceptable and unacceptable reasons for delaying a criminal prosecution once it has begun. And such is the nature of the prejudice presumed that the weight we assign to official negligence compounds over time as the presumption of evidentiary prejudice grows. Thus, our toleration of such negligence varies inversely with its protractedness, ... and its consequent threat to the fairness of the accused's trial.

505 U.S. at 656–57, 112 S.Ct. 2686 (citations omitted).

 Here, of course, the negligence-caused delay was brief (two months), not at all protracted (such as the six years in *Doggett*), and whatever small threat of lost evidence it may have posed that threat was more than made up for by its lessening the risk of a jury biased against Goben because of his prior offenses.[14] Although the delay from July to September was unfortunate, absent some showing that it actually prejudiced Goben, its weight against the government in the speedy trial balance strikes us as minimal.

With respect to prejudice, the fourth *Barker* factor,[15] the Supreme Court has observed that

unreasonable delay between formal accusation and trial threatens to produce more than one sort of harm, including "oppressive pretrial incarceration," "anxiety and concern of the accused," and "the possibility that the [accused's] defense will be impaired" by dimming memories and loss of exculpatory evidence.... Of these forms of prejudice, "the most serious is the last, because the inability of a defendant adequately to prepare his case skews the fairness of the entire system."

*Doggett*, 505 U.S. at 654, 112 S.Ct. 2686 (quoting *Barker*, 407 U.S. at 532, 92 S.Ct. 2182). Goben offers no reason to suppose that the two-month delay occasioned by the trial court's misstep in July meaningfully prejudiced the interests the speedy trial right protects. By that point he was incarcerated pursuant to his October 2013 conviction, so the two month continuance did not contribute to or amount to an "oppressive pretrial incarceration." It perhaps did prolong slightly Goben's "anxiety and concern" regarding the August 2009 charges, but he does not specify any such claim, and we have held that vague, conclusory claims about the "trauma of incarceration" or the burden of post-accusation

14. Goben argues that the trial court was actually negligent twice: once when it misread the indictment and then again when it explained its mistake to the jury panel. Goben maintains the court should have simply dismissed the panel without explanation since the reason for the dismissal—Goben's prior trafficking conviction—probably would not have registered with any of the potential jurors, and trial could have been rescheduled promptly with a new panel from the same jury pool. Clearly, Goben did not suggest that course in July 2014. On the contrary, while the Commonwealth urged the court to assemble a new panel the next day and rely on voir dire to screen out tainted jurors, Goben insisted that the pool should be deemed irremediably poisoned. Ultimately, the trial court agreed. Be that as it may, we are not persuaded that the risk of taint could have been avoided in the manner Goben now suggests, since Goben's prior offense registering with at least few of the potential jurors does not seem to us at all farfetched even without the court's explanation.

15. We are assuming, as noted above, that Goben adequately asserted his speedy-trial right, which is *Barker's* third factor.

"anxiety and concern" are not entitled to speedy-trial "weight." *Bratcher v. Commonwealth*, 151 S.W.3d 332, 345 (Ky. 2004). Most importantly, Goben does not suggest any way in which the July to September continuance impaired his defense. Absent a compelling reason to presume prejudice (such as the six-year delay at issue in *Doggett*) or some showing of actual prejudice, we conclude that Goben's speedy trial claim fails. The first *Barker* factor, the five years it took to try Goben's August 2009 charges, is definitely an eyebrow raiser but the other factors—Goben's lackluster assertion of his speedy-trial right, the four-year delay necessitated by the trial of Goben's December 2009 charges, and Goben's failure to indicate how any additional delay added much to his anxiety or impaired his defense to the August 2009 charges—all weigh heavily in favor of the Commonwealth and against Goben's claim.

Against this conclusion Goben argues, in effect, that the numerous changes of counsel that took place during the five years this case was pending (three Commonwealth attorneys, according to Goben, as well as seven defense attorneys) unreasonably delayed the proceedings and prejudiced him in various ways. It prolonged his pretrial incarceration, for one thing, which Goben claims was particularly "oppressive" in his case because he was in need of medical treatment the jail did not provide and for which the division 8 judge would not give him a release. Moreover, he claims the lack of continuity in his representation, hampered discovery and led directly to an error by counsel during the penalty phase of Goben's September 2014 trial.

Goben does not explain why, pursuant to the *Barker* balancing analysis, all of these changes of counsel and their associated delays should be weighed against the Commonwealth. The Commonwealth had nothing to do, for example, with the two times Goben's private counsel withdrew, or the two times Goben first waived his Public Defender attorney's conflict but then, as trial approached, asserted it and insisted on conflict counsel. There are legitimate reasons, moreover, for Commonwealth attorneys to come and go, and Goben does not explain why the changes during his cases should be deemed illegitimate.

As noted above, it appears that there was, or at least may have been, a significant delay associated with Goben's initial 2010 request for conflict counsel, as a number of the attorneys appointed pursuant to the Public Defender's Office's Assigned Counsel Plan promptly moved to withdraw. During that search for conflict counsel, there appear to have been periods when Goben lacked representation, delays in obtaining defense counsel which Goben insists weigh against the Commonwealth. We disagree.

In *Vermont v. Brillon*, 556 U.S. 81, 129 S.Ct. 1283, 173 L.Ed.2d 231 (2009), the Supreme Court rejected the Vermont Supreme Court's holding that an assigned counsel's failure "to move the case forward" could be assigned to and weighed against the State for Sixth–Amendment speedy-trial purposes. 556 U.S. at 92, 129 S.Ct. 1283. On the contrary,

assigned counsel generally are not state actors for purposes of a speedy-trial claim. While the Vermont Defender General's office is indeed "part of the criminal justice system," ... the individual counsel here acted only on behalf of [defendant], not the State.

*Id.* (citation omitted). On the other hand, the Court noted that "[t]he general rule attributing to the defendant delay caused by assigned counsel is not absolute. Delay resulting from a systemic breakdown in the public defender system, could be

charged to the State," 556 U.S. at 94, 129 S.Ct. 1283 (citation and internal quotation marks omitted), as could be periods the defendant lacked an attorney, "if the gaps resulted from the trial court's failure to appoint replacement counsel with dispatch." 556 U.S. at 85, 129 S.Ct. 1283.[16]

Here then, delays resulting from assigned counsels' motions to withdraw are not attributable to the Commonwealth, and Goben has not alleged or attempted to show "a breakdown in the public defender system." Nor has he alleged that the trial court or the Public Defender's Office failed to address his need for conflict counsel with "dispatch."

Notably, we rejected Goben's similar speedy-trial claim in his appeal from his conviction in the December 2009 case for essentially the same reasons. The four-year post-accusation delay in that case, we noted, was presumptively prejudicial under *Barker*, but the principal reasons for the delay—coordinating proceedings in the separate cases, plea negotiations, and "finding representation for Goben"—were all valid, and in conjunction with Goben's failure to identify any meaningful prejudice, weighed decisively against his speedy-trial claim. *Goben*, 2015 WL 4967251 at *3. Thus, even disregarding, as Goben does, the need to postpone trial in this case pending trial in the December 2009 case, the delays of which he complains due to changes of counsel do not add up to a speedy-trial violation.

The result would be the same even if, in light of *Brillon*, we weighed against the Commonwealth periods during the search for conflict counsel in 2010, 2011, and 2012

when Goben was left unrepresented. Even if we accept Goben's allegations and assume that the government was somehow lax during these periods and failed to provide Goben with substitute counsel with the requisite "dispatch," Goben does not suggest that the delay was deliberate so as to hamper his defense. Nor does Goben identify prejudice from those hypothetically negligent delays substantial enough to warrant a dismissal of the charges in this case.

As noted above, Goben complains that the delays unnecessarily prolonged his peculiarly "oppressive" incarceration. In fact, Goben was incarcerated, not just on the August 2009, charges, but also on the charges stemming from his December 2009 meth activities. He admits, as the record shows, that the "extra" oppressiveness of which he complains—the denial of his repeated requests for leave to seek medical attention—was imposed not in this case but in the other one. The alleged oppressiveness of Goben's concurrent incarceration in this case thus becomes a moot point.

Goben also complains that the lack of continuity in his representation resulted both in the Commonwealth's being slow to provide discovery and in a costly penalty-phase error by trial counsel. These, however, are not the sort of harms the speedy-trial guarantee is meant to prevent. Goben does not allege that the delay in bringing him to trial hampered his defense by making unavailable exculpatory evidence that would have been available had he been tried more promptly. He does not allege that because of delay evidence was lost, witnesses disappeared, or memories faded.

---

16. Because attorney Mory was replaced by attorney Florio with "dispatch," the two months during which Goben lacked counsel for the sake of that replacement should not be charged to the Commonwealth. But see, Note, *Speedy Trial as a Viable Challenge to Chronic*

*Underfunding in Indigent Defense Systems,* 113 Mich. L. Rev. 279, 281 (Nov. 2014) (discussing the tension between the speedy-trial right and the delays caused by "the overworking and furloughing of indigent-defense attorneys.").

*Doggett,* 505 U.S. at 647, 112 S.Ct. 2686. The speedy trial clause does not guarantee continuous or effective representation or prompt discovery. To the extent that Goben's rights to those things were violated, he may have other recourse, but the alleged violations were not the result of trial delay and so do not add any weight to Goben's speedy-trial claim. In sum, after a thorough *Barker* analysis, we find no speedy trial violation that would justify Goben's requested dismissal of the charges against him.

## II. Although it Exceeded Slightly the Statutory Deadline, the Trial Court Did Not Violate Goben's KRS 500.110 Right to the Prompt Disposition of His Charges.

In addition to the general constitutional requirement that criminal charges be resolved without unnecessary delay, KRS 500.110 provides persons who have "entered upon a term of imprisonment in a penal or correctional institution of this state," and who, during that term of imprisonment, have "pending in any jurisdiction of this state any untried indictment, information or complaint on the basis of which a detainer has been lodged against" him, a right to "be brought to trial within one-hundred and eighty (180) days after he shall have caused to be delivered to the prosecuting officer and appropriate court of the prosecuting officer's jurisdiction written notice of the place of his imprisonment and his request for a final disposition

to be made of the indictment, information or complaint." The purpose of the statute is not to ensure the speedy disposition of every criminal charge but rather to lessen "the detrimental effect that detainers have on the prison population" by providing inmates who have had detainers lodged against them with a means of bringing about the speedy resolution of the underlying charges. *Rosen v. Watson,* 103 S.W.3d 25, 29 (Ky. 2003) (citing and approving *Huddleston v. Jennings,* 723 S.W.2d 381 (Ky. App. 1986)).

Once Goben had been convicted and sentenced in the December 2009 case, it appears he began his term of imprisonment at the Hopkins County Jail. According to Goben, Jefferson County then lodged with the Department of Corrections "documents which are currently being treated as a detainer," on the basis of the August 2009 charges.[17] On or about February 19, 2014, Goben, pursuant to KRS 500.110, filed a *pro se* motion with the Jefferson Circuit court for speedy resolution of those charges and gave the required notice to the appropriate "prosecuting officer." The statutory speedy-trial clock thus activated, both the trial court and the Commonwealth made diligent efforts to abide by the statutory limits. Trial was set first for early June and then, when Goben requested a continuance following the Commonwealth's acknowledgment of Robin Taylor's new revelations, was reset for mid-July, still well within the 180-day allow-

---

17. The alleged documents "treated as a detainer" do not appear in the record, and ordinarily we might dispose of Goben's statutory speedy-trial claim on the ground that he failed to meet his burden of showing that a detainer had been lodged against him. *See Donahoo v. Dortch,* 128 S.W.3d 491 (Ky. 2004) (discussing both what constitutes a "detainer" for the purposes of KRS 500.110 and what proof of a detainer must be adduced to invoke the statute). Here, however, not only

did the Commonwealth not dispute Goben's assertion that a detainer had been lodged, but it effectively endorsed that assertion by urging the trial court to abide by the speedy-trial statute's terms. In these circumstances, and because Goben's claim is readily addressed on other grounds, we elect not to scrutinize the adequacy of Goben's allegations. By far the better practice, however, is to incorporate in the record the document(s) alleged to bring KRS 500.110 into play.

ance. Unfortunately, as noted above, an error by the trial court at the outset of the July trial necessitated an additional two-month postponement, the first month to ensure a new jury pool unlikely to have been affected by the trial court's mistake and a second month to accommodate Goben's counsel's schedule, including his vacation plans. This additional postponement pushed the trial, which began on September 16, 2014, about a month beyond the statutory deadline of August 19, 2014. Soon after that deadline expired, on about September 4, 2014, Goben moved *pro se* for the dismissal with prejudice of the two indictments (09–CR–3638 and 10–CR–0177) still pending against him. As noted above, the trial court did not expressly rule on the *pro se* motion, and counsel did not raise the issue. Instead, Goben was tried as scheduled, was found guilty of both manufacturing and trafficking in methamphetamine and was sentenced to life in prison. Goben contends that the trial court erred by trying him beyond the statutory speedy-trial deadline. We disagree.

 As we noted in *Darcy v. Commonwealth,* 441 S.W.3d 77, 88 (Ky. 2014), KRS 500.110's general rule—that upon a proper request the charges underlying a detainer must be tried within 180 days—is subject to the statutory proviso that " 'for good cause shown in open court, the prisoner or his counsel being present, the court having jurisdiction of the matter may grant any necessary or reasonable continuance.' " (quoting KRS 500.110). Under the speedy-

trial statute, therefore, trial courts have "the ability to grant continuances extending the disposition of the untried indictment beyond 180 days after the statutory right is invoked." *Id.* (citing *Wells v. Commonwealth,* 892 S.W.2d 299, 303 (Ky. 1995)). The extension need only be "necessary or reasonable." In *Darcy,* we held that a co-defendant's request for a continuance might very well have met that standard and so should not have been denied solely because of Darcy's invocation of KRS 500.110.

Here, the need to ensure that Goben was tried by a jury unaffected by the trial court's mistake in reading the indictment and to accommodate defense counsel's schedule, made the two-month postponement and one-month breach of the statutory limit perfectly reasonable. The reasons for delay were weighty, the delay tended to benefit Goben, and it was not so prolonged as to deprive Goben completely of the speedy-trial statute's benefits.[18] The delay in trying Goben with trial beginning less than thirty days beyond the 180 day period did not violate Goben's statutory right to a speedy trial.

## III. The Police Officers' Warrantless Entry of Goben's Apartment Did Not Violate Goben's Constitutional Right to be Free From Unreasonable Searches.

 Goben next challenges the initial warrantless entry of his apartment by Officers Heitzman and Stokes, whose

18. Goben contends that the two-month continuance was not "necessary and reasonable," because had the trial court handled the situation differently and not told the jury panel what was wrong with the court's reading of the indictment, a new panel could have been called the next day or soon thereafter from the same jury pool with little risk of any potential juror's having noted or been told about Goben's prior trafficking conviction. We addressed this contention in conjunction with Goben's constitutional claim in footnote 14 above. We reiterate that the "little risk" of juror bias Goben now claims he would have been willing to take for a prompt trial is one he was not willing to take at the time. In any event, the risk was not so negligible that the trial court erred in choosing to proceed as it did.

plain-view observations of drugs and drug paraphernalia supported the subsequent application for a search warrant. Goben contends their entry was unreasonable in the circumstances and thus violated his rights under the Fourth Amendment to the United States Constitution and Section 10 of the Kentucky Constitution to be free from unreasonable searches and seizures.[19] He insists the trial court's ruling to the contrary following the May 2014 suppression hearing was erroneous. We disagree.[20]

Goben correctly observes that warrantless searches of a home have been deemed presumptively unreasonable under both constitutions—the privacy and sanctity of the home perhaps the most fundamental interest protected by the constitutional provisions, *Welsh v. Wisconsin*, 466 U.S. 740, 748, 104 S.Ct. 2091, 80 L.Ed.2d 732 (1984). Nevertheless, as this Court noted in *Hughes v. Commonwealth*, 87 S.W.3d 850 (Ky. 2002), under one of the widely recognized exceptions to the warrant requirement, police officers are not barred from making warrantless entries and searches of a residence "when they reasonably believe that a person within is in need of immediate aid." 87 S.W.3d at 852 (citing *Mincey v. Arizona*, 437 U.S. 385, 392, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978)).

In *Hughes*, a warrantless entry was upheld because the entering officer could reasonably believe that a person reported missing was inside and was possibly in need of immediate aid. And in *Mincey*, in addition to noting that aspect of the "immediate aid" exception, the Court also stated that "when the police come upon the scene of a homicide they may make a prompt warrantless search of the area to see if there are other victims or if a killer is still on the premises." 437 U.S. at 392–93, 98 S.Ct. 2408 (ultimately holding that

---

**19.** Amendment IV to the United States Constitution provides in pertinent part that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." Section 10 of the Kentucky Constitution provides in pertinent part that "[t]he people shall be secure in their persons, houses, papers and possessions, from unreasonable search and seizure." As with the constitutional speedy-trial right discussed above, this Court has held that " 'Section 10 of the Kentucky Constitution provides no greater protection than does the federal Fourth Amendment,' " *Chavies v. Commonwealth*, 354 S.W.3d 103, 107 (Ky. 2011) (quoting *LaFollette v. Commonwealth*, 915 S.W.2d 747, 748 (Ky. 1996), and thus the United States Supreme Court's construction of the federal provision informs our state right as well. *See e.g., Chavies*, 354 S.W.3d at 109 (following the Supreme Court's lead in rejecting an "inadvertent discovery" element as a prerequisite to application of the "plain view" exception to the warrant requirement); *Estep v. Commonwealth*, 663 S.W.2d 213, 215 (Ky. 1983) (following *United States v. Ross*, 456 U.S. 798, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982), in

upholding the search of a lawfully stopped automobile).

**20.** At the time of Goben's trial, in September 2014, pretrial motions to suppress evidence were governed by Kentucky Rule of Criminal Procedure (RCr) 9.78. Under that rule, reviewing courts applied a two-step process like that noted above with respect to Goben's speedy-trial claim: the trial court's findings of historical fact were to be upheld if supported by substantial evidence, but the mixed questions of law and fact involved in the application of constitutional standards were reviewed de novo. *Simpson v. Commonwealth*, 474 S.W.3d 544, 546–47 (Ky. 2015) (citing *Adcock v. Commonwealth*, 967 S.W.2d 6 (Ky. 1998), and *Payton v. Commonwealth*, 327 S.W.3d 468 (Ky. 2010)). As we noted in *Simpson*, however, effective January 1, 2015, RCr 8.27 superseded RCr 9.78. Unlike its predecessor, the new rule does not address an appellate standard of review for suppression rulings, but we have since held that the same two-step, clear-error/de-novo approach to review continues to apply. *Davis v. Commonwealth*, 484 S.W.3d 288 (Ky. 2016) (citing *Simpson* ).

the extensive premises search at issue exceeded the scope of these "immediate aid" exceptions: "[A] warrantless search must be strictly circumscribed by the exigencies which justify its initiation.") (citation and internal quotation marks omitted).

More recently, the Supreme Court has confirmed that under this "emergency aid exception [to the warrant requirement]," "law enforcement officers 'may enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury.'" *Michigan v. Fisher,* 558 U.S. 45, 47, 130 S.Ct. 546, 175 L.Ed.2d 410 (2009) (quoting *Brigham City v. Stuart,* 547 U.S. 398, 403, 126 S.Ct. 1943, 164 L.Ed.2d 650 (2006)). In both *Fisher* and *Brigham City,* the Court upheld warrantless entries of residences by police officers who sought to intervene in domestic disturbances where the circumstances made it objectively reasonable to believe that some occupant either was seriously injured or was imminently threatened with injury and thus was " 'in need of immediate aid.' " *Id.* (quoting *Mincey,* 437 U.S. at 392, 98 S.Ct. 2408). The Court explained that "[t]his 'emergency aid exception' does not depend on the officers' subjective intent or the seriousness of any crime they are investigating when the emergency arises." *Id.* Nor does it require the officers to have "ironclad proof of a likely serious, life-threatening injury." *Fisher,* 558 U.S. at 49, 130 S.Ct. 546 (internal quotation marks omitted). The test, rather, is "whether there was 'an objectively reasonable basis for believing' that medical assistance was needed, or persons were in danger." *Id.* (citations omitted). Hindsight determinations that in fact there was no emergency, the Court noted, or that innocuous explanations were conceivable, do not replace the "objective inquiry into [the] appearances [and] ... ominous circumstances"

that confronted the officer. *Id.* As one of the federal Courts of Appeals put it in *Hanson v. Dane County Wisconsin,* 608 F.3d 335 (7th Cir. 2010), an opinion upholding a warrantless residence entry by officers investigating a 911 hangup call after the dispatcher's return call went unanswered, "probable cause just means a good reason to act, ... it does not mean certainty, or even more likely than not, that a crime has been committed or a medical emergency is ongoing." 608 F.3d at 338 (citation omitted).

Under the "emergency aid" exception, courts in other drug cases have upheld warrantless residence entries in circumstances akin to those that confronted Officers Heitzman and Stokes in this case. *See, e.g., People v. Troyer,* 51 Cal.4th 599, 120 Cal.Rptr.3d 770, 246 P.3d 901 (2011) (holding warrantless entry to search for additional victims was reasonable where, responding to a report of a shooting with a male victim, the officer found a female victim and a man (injured but not shot) on the porch of the residence, saw blood near the door handle, and was told in a seemingly uncertain manner that no one else was inside); *People v. Rodriguez,* 77 A.D.3d 280, 907 N.Y.S.2d 294 (2010) (holding that warrantless entry of third-floor apartment to search for additional victims was reasonable where, responding to a report of a stabbing on the fifth floor of an apartment complex, the officer was told by the victim that he did not reside at the complex and had been attacked for no apparent reason on the fifth floor, but there was a blood trail leading to the door of an apartment on the third floor where no one responded to the officer's knocks); *Riggs v. State,* 918 So.2d 274 (Fla. 2005) (holding that warrantless entry of apartment was justified to search for a possibly incapacitated caretaker where, responding to a report that at 3:00 a.m. a naked, disoriented, four-year-old had been found

wandering the corridors of an apartment complex, the officers found an apartment with the door ajar and lights on inside but no one responded to their knocks and calls). In *Troyer*, the California Supreme Court supported its ruling by likening the circumstances that confronted the officer in that case with those in another case where circumstances raising the possibility of a medical emergency "remained sufficiently ambiguous" to warrant the officer's further inquiry. 120 Cal.Rptr.3d 770, 246 P.3d at 907 (citation and internal quotation marks omitted).

We agree with the trial court that the ambiguous circumstances confronting Officers Heitzman and Stokes in this case were likewise suggestive enough of a medical emergency to justify their brief warrantless entry into Goben's apartment. The officers could be certain that a significantly violent incident involving Goben had taken place somewhere given the many bloody patches found in the parking lot as well as the seriously wounded Goben himself. The bloody patches seemed to begin near the base of the stairs, however, and on the stairs and along the second-floor walkway, the "debris" discovered by the officers— the clothing, jewelry, broken chair leg, and upended beverage cup—could reasonably be thought additional signs of struggle.

The items could reasonably constitute a "trail," at least when considered in conjunction with the badly injured Goben's refusal to tell the officers what had happened and with the fact that the "debris" seemed to lead to and to stop at the only open door, an unusual circumstance in that apartment complex in the wee hours of the morning. The light on inside the apartment suggested a person's presence, so when the officers' knocks and calls went unanswered there arose the real possibility that the violence evident in the parking lot extended to the apartment where another victim might be in need of emergency aid.

 To be sure, as Goben insists and as the trial court found, the "blood trail" did not extend beyond the parking lot. The "debris trail," moreover, could be given a more innocuous interpretation, and it may well be that the officers themselves found the "debris trail" less significant than the open door, which likely would have caught their attention even without the possible evidence of a scuffle on the stairway leading to the apparent stabbing in the parking lot. But as the Supreme Court noted in *Fisher*, the "emergency aid" exception does not require "ironclad proof" of a medical emergency, it is not precluded by ambiguities, and it does not hinge on the officer's subjective state of mind [21].

21. Several of Goben's *pro se* motions attacking the search of his apartment focus in particular on what he claims was the bad faith of Officers Heitzman and Stokes, who Goben alleges had no genuine belief that a victim or perpetrator might have been in the apartment, exceeded the scope of the warrantless search by observing things that were not in plain view, and used their illegal observations falsely to support the search warrant affidavit. Throughout the case, even after the suppression hearing, Goben was tireless in his search for evidence he believed supported these allegations, and every new such discovery prompted a *pro se* motion to revisit the trial court's suppression ruling. Even at sentencing Goben insisted that the report by Matthew

Vanderpool, the member of the Jefferson County Health Department's Hazardous Materials Team who performed the "meth check" on Goben's apartment, called into question the timing and scope of the police officers' searches.

At the outset of the suppression hearing, the Commonwealth moved for clarification of the suppression issue, and Goben's counsel expressly limited that issue to whether Heitzman and Stokes had adequate grounds (as reported to Detective White, who was the only suppression-hearing witness) to make a warrantless entry. To the extent that Goben contends that the officers' subjective beliefs about the possible existence of a medical emergency

Nor is it to be assessed, as Goben urges, in light of "hindsight determination[s] that there was in fact no emergency." *Fisher,* 558 U.S. at 49, 130 S.Ct. 546. As noted above, the test is "whether there was 'an objectively reasonable basis for believing' that medical assistance was needed, or persons were in danger." *Id.* (quoting *Brigham City,* 547 U.S. at 406, 126 S.Ct. 1943). The circumstances confronting Officers Heitzman and Stokes at Goben's apartment complex that early morning in August 2009, included clear evidence of significant violence with evidence possibly connecting that violence to a lighted apartment with an open door where no one responded to the police officers' knocks and cries. These circumstances gave them "an objectively reasonable basis" to believe that medical assistance might be needed in that apartment, and thus justified their warrantless entry.

## IV. None of the Alleged Evidentiary Errors Was Reversible.

We turn next to what Goben claims were three evidentiary errors, two during his trial's guilt phase—a preserved error regarding "investigatory hearsay," and an allegedly palpable error regarding irrele-

vant firearm evidence—and one during the penalty phase—a belatedly raised objection regarding the admission into evidence of Goben's not-yet-final October 2013 conviction for meth manufacturing and trafficking. None of these alleged errors entitles Goben to relief. We begin with the one that was preserved.

### A. The Detective's Hearsay Testimony Was Improper But Harmless.

Goben contends that the trial court erred by permitting the Commonwealth to elicit hearsay testimony from Detective Steve Healy, the detective summoned when the search of Goben's apartment yielded evidence of methamphetamine production. Healy not only had extensive training and experience in methamphetamine interdiction, he also was one of two officers in Jefferson County certified to address the health and safety risks posed by the chemicals used in meth manufacturing. As noted above, in the course of his investigation, Healy interviewed Goben's girlfriend at the time, Cindy Tilford, and Tilford's friend and roommate, Robin Taylor. According to Healy, both women appeared in MethCheck (a database, apparently,

were not adequately taken into account at the suppression hearing, in *Brigham City* and *Fisher* the Supreme Court undercut that contention by saying that the test for whether the "emergency aid" exception applies is an objective one. ("[T]he test, as we have said, is not what [the officer] believed." *Fisher,* 558 U.S. at 49, 130 S.Ct. 546.) To the extent that Goben's pro se motions and his appellate brief impliedly reject and criticize counsel's approach to the suppression issue, and in particular counsel's choice not to attack the search warrant, the veracity of Heitzman and Stokes, or the scope of the officers' "emergency aid" search, Goben's concerns would be more appropriately raised under RCr 11.42. And to the extent, finally, that Goben seeks to raise the specter of a *Brady* violation (*Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10

L.Ed.2d 215 (1963)) in conjunction with what he claims was the Commonwealth's failure to disclose Matthew Vanderpool's report, we note that the Supreme Court has identified "three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene,* 527 U.S. 263, 281–82, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999). In as much as the record before us does not make possible a meaningful assessment of any of these components, especially the last, which Goben appears not even to have alleged, this claim too is one best left to collateral proceedings.

like if not the same as the National Precursor Log Exchange System noted above), as then having recently purchased large amounts of pseudoephedrine-containing cold medicine. Over Goben's objection, Healy was allowed to testify that both women told him that they made the purchases on behalf of Goben and gave the medicine to him.[22]

Goben contends, and the Commonwealth concedes, that the detective's testimony conveying what the women told him was pure hearsay, i.e., out-of-court statements "offered in evidence to prove the truth of the matter asserted," KRE 801(c)). Moreover, the testimony was NOT made admissible (as the trial court mistakenly ruled) pursuant to a hearsay exception for "investigative hearsay," an illusory concept this Court has found difficult to eradicate. See, e.g., Sanborn v. Commonwealth, 754 S.W.2d 534, 541 (Ky. 1988) (overruled on other grounds by Hudson v. Commonwealth, 202 S.W.3d 17, 22 (Ky. 2006)); Ruiz v. Commonwealth, 471 S.W.3d 675 (Ky. 2015).

▆▆▆ Notwithstanding what it concedes was an error, the Commonwealth contends that Detective Healy's testimony repeating statements by Tilford and Taylor was harmless and not a ground for relief in light of the fact that Taylor testified immediately prior to the detective. During that testimony, she admitted giving a statement

to Healy, in part reduced to writing, to the effect that she and Tilford had on a number of occasions, including that day, purchased Sudafed for Goben with the understanding that they would be paid $100 per box. Taylor's written statement, once she had authenticated it, was introduced into evidence and shown to the jury. In it, she wrote: "I, Robin Taylor, has been buying Sudaped pills for Kenny Goben. I pick up the pills and gave them to him. I meet him through my roommate. I have bought this 3x."

During her direct examination by the Commonwealth, Taylor acknowledged that she was not there testifying because she wanted to be, but only because she had been subpoenaed. On cross-examination, her tune changed considerably, and she testified that notwithstanding what she told Detective Healy back in 2009 she had never actually spoken directly with Goben about buying Sudafed or given the Sudafed she purchased directly to him. Instead, she had handed over the Sudafed she bought to Tilford who told her it was going to Goben.[23]

We agree with the Commonwealth that Taylor's testimony rendered Detective Healy's hearsay testimony cumulative and harmless beyond a reasonable doubt. We addressed a similar situation in Dickerson v. Commonwealth, 485 S.W.3d 310 (Ky. 2016). There, a police investigator was per-

---

22. Detective Healy explained that with the increased regulation of the sale and purchase of products that contain pseudoephedrine or ephedrine (the precursor of methamphetamine in most of the production methods), it had become common practice in the methamphetamine business for "cooks,"—meth makers—not to purchase those products themselves, but instead to employ others—persons sometimes referred to in the drug trade as "smurfs"—to purchase those products for them, in exchange either for drugs or for cash. Tilford and Taylor, according to Healy, were "smurfs" for Goben.

23. This, with appropriate variations, was the basis of Goben's "reasonable doubt" defense: yes there was circumstantial evidence of meth making and trafficking, but since there was no direct evidence of Goben's doing either, and since Goben was not shown to have had exclusive control over his apartment and his storage locker where the indirect evidence was found, then someone else—Tilford, or some friend of Tilford—could have been the guilty party.

mitted to summarize at trial what he had been told by· some thirteen or fourteen interviewees regarding an alleged playground incident. We rejected the Commonwealth's contentions that "investigative hearsay" applied or that the officer's ·paraphrasing or summarizing what he was told answered the hearsay objection. Citing *Crawford v. Washington,* 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), and *Melendez–Diaz v. Massachusetts,* 557 U.S. 305, 129 S.Ct. 2527, ·174 L.Ed.2d 314 (2009), we noted that because the out-of-court statements to a police investigator were "testimonial," as the United States Supreme Court has defined that term, they implicated the Confrontation Clause of the Sixth Amendment to the United States Constitution as well as the hearsay rules. Nevertheless, because four of the officer's interviewees testified at trial, both confirming the officer's summary with detailed particulars as well as allowing for cross-examination, the significance of the other interviewees, we noted, was greatly reduced. These facts, together with the "overwhelming evidence of Dickerson's guilt," convinced us that ·there was "no reasonable possibility that it [the officer's improper testimony] ·contributed to [the] conviction," and thus that the error was harmless beyond a reasonable doubt. *Dickerson,* 485 S.W.3d at 327–28 (citing *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); · *Taylor v. Commonwealth,* 175 S.W.3d 68 (Ky. 2005); and *Staples v. Commonwealth,* 454 S.W.3d 803 (Ky. 2014) in discussing the harmless error standard for constitutional errors).

For similar reasons we are ·convinced that Detective Healy's improper testimony repeating statements made to him by Tilford and Taylor was harmless beyond a reasonable doubt.[24] Clearly, the detective's testimony was harmless with respect to the statement he attributed to Taylor, since she had just testified that she made that statement and was cross-examined with respect to it. In light of Taylor's testimony, moreover, including the statement *she* attributed to Tilford during cross-examination, the statement the detective attributed to Tilford became a cumulative add-on to the Commonwealth's case, a minor addition to the otherwise overwhelming evidence that Goben made and sold methamphetamine. Although, like any evidence favorable to the Commonwealth, Detective Healy's testimony repeating Tilford's out-of-court statement might have contributed marginally to the jury's confidence in its decision, there is simply no reasonable possibility that the detective's improper testimony contributed to the conviction.

### B· The Introduction Of What May Have Been Insufficiently ·Probative Firearm Evidence· Did Not Amount to a Substantial Error.

▮ Goben's second allegation of evidentiary error also relates to the testimony by Detective Healy. Detective Healy testified, as has been noted, both as a fact. witness—one of the investigators who gathered evidence against Goben—and also as an "expert in narcotics trafficking and methamphetamine."[25] In the latter role, he testified concerning general facts

---

**24.** Goben has not raised a Sixth Amendment claim. At trial and on appeal he only discusses the hearsay violation. Even under the stricter constitutional standard the error here was harmless.

**25.** Several of the federal Circuit Courts of Appeal have noted that such "dual role" testi-

mony by police officers poses risks of which trial courts should be aware. *See, e.g., United States v. Moralez,* 808 F.3d 362, 365–67 (8th Cir. 2015) (collecting cases and discussing possible ways to mitigate the perceived risks). We note the concern, but have no occasion in · this case to address it.

about the illicit drug trade—describing, for example different methods by which methamphetamine is chemically "cooked," and explaining the role of "smurfs" in the meth production process. Detective Healy was also asked a number of times to opine as an expert whether items seized in this case, items not obviously evidence of a crime (*e.g.*, plastic baggies and coffee filters), had a drug-crime connotation that made them evidence here. The detective testified, for example, that the magnetic key holders many people use to attach a spare key to the underside of their car are often used by drug traffickers to carry illegal drugs separate from their persons. The discovery of such a key holder in Goben's apartment could, in conjunction with the other evidence suggestive of drug dealing, be thought evidence of Goben's trafficking in methamphetamine.

KRE 702, "Testimony by experts," permits testimony of a witness whose "knowledge, skill, experience, training, or education" enables him or her "to assist the trier of fact to understand the evidence." Pursuant to this rule, we have allowed duly experienced and trained law enforcement officials to testify as experts concerning the modus operandi of drug dealers with respect to activities outside the knowledge of most jurors, including the potential criminal significance of a person's use or possession of seemingly innocuous household items. *McCloud v. Commonwealth,* 286 S.W.3d 780, 787–88 (Ky. 2009) (citing *Dixon v. Commonwealth,* 149 S.W.3d 426, 429–31 (Ky. 2004) for the proposition that a formal *Daubert* hearing (*Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993)) is not always necessary in this police-officer-as-drug-trade-expert context). Many other courts have ruled similarly. *See, e.g., United States v. Jeanetta,* 533 F.3d 651, 657 (8th Cir. 2008) (explaining that "[a] district court has discretion to allow law enforcement officials to testify as experts concerning the modus operandi of drug dealers") (citation and internal quotation marks omitted); *United States v. Lopez,* 547 F.3d 364, 373 (2nd Cir. 2008) (noting that "[t]his court has repeatedly found that the operations of narcotics dealers are a proper subject for expert testimony").

Given this precedent, only once did Goben object to the "expert" portions of Detective Healy's testimony—his reference to "residue" depicted in a picture of a seized coffee grinder—but the objection was overruled when it was pointed out that a forensic lab analyst had already testified that the coffee grinder tested positive for ephedrine/pseudoephedrine residue. In particular he did not object when Healy testified that his search of Goben's storage locker yielded, among other things, two 22 caliber rifles along with corresponding ammunition. This evidence was relevant, he testified (switching to expert mode), because the rifles suggested meth trafficking. In response to the Commonwealth's question, "Is it unusual for traffickers to have weapons," Healy answered, "Not at all." When then asked, "why it is common for traffickers to have firearms," he stated, "Because it is common for them to be robbed." According to Detective Healy, drug traffickers (who, for obvious reasons, cannot rely on the police) commonly use firearms for protection of themselves, their drug supplies, and the proceeds of their sales.

Goben maintains that "it was completely irrelevant whether [he] had guns stored in his locker," and he contends that introduction of the irrelevant evidence, notwithstanding the lack of an objection, amounted to a palpable error. Specifically, he alleges the rifles—dramatically exhibited before the jury—were intended to make him appear a bad and dangerous person, a

perception ultimately reflected in the maximum sentences the jury imposed.

There are problems, however, with Goben's claim that the rifles were irrelevant. Noting the definition of relevant evidence—evidence having any tendency to make a material fact more or less probable (KRE 401)—he complains that his ownership of the guns in the storage shed cannot reasonably be thought to make it "any more likely that [he] manufactured meth." The Commonwealth did not introduce the rifles, however, as evidence of Goben's alleged manufacturing. As just noted, Detective Healy testified that firearms in conjunction with drugs could be thought evidence of trafficking. Numerous courts have so held. *See, e.g., United States v. Manigan,* 592 F.3d 621, 630 (4th Cir. 2010) (" '[T]he law has uniformly recognized that substantial dealers in narcotics possess firearms.' ") (quoting (with internal quotation marks omitted) *United States v. Kennedy,* 32 F.3d 876, 882 (4th Cir. 1994)).

In response, Goben relies on cases such as *Harris v. Commonwealth,* 384 S.W.3d 117 (Ky. 2012) in which this court has applied the general rule that "[w]eapons that are known to have no connection to the crime ... are generally not admissible." 384 S.W.3d at 123. Unlike this case, *Harris* did not involve drug crimes but was a murder prosecution where the victim had been killed by someone using a 38 caliber handgun. The defendant, Harris, owned two 38 caliber handguns, but ballistics testing established that neither of Harris's guns was the murder weapon. Because Harris's guns were thus "known to have no connection to the crime," we applied the general rule and held that the trial court had erred by admitting Harris's ownership of the similar guns into evidence. In so ruling, we rejected the Commonwealth's argument that Harris's

familiarity with, access to, and ostensible preference for the type of weapon used in the killing amounted to circumstantial evidence identifying Harris as the perpetrator. The inference the Commonwealth wished to draw simply was not there given the ubiquity of .38 caliber handguns and the fact that evidence of ownership alone said nothing about Harris's habits or his conduct on a particular occasion.

Goben's reliance on *Harris* and his attempt to extend its general rule to the very different drug-crime context is unconvincing. In *Harris,* ballistics testing established the guns were not "connected to the crime" alleged in that case, a murder, but there was no comparable evidence in this case from which one could know with a fair degree of certainty that Goben's guns were not connected to the alleged crime of trafficking. Detective Healy testified that firearms were commonly connected to trafficking, and it was altogether possible, perhaps probable, that these guns were a means of protecting some aspect of Goben's ongoing drug selling operation. As we noted in *Harris,* "where there is a possible connection to the crime but that connection is not definitively established," the connection becomes a jury question, and the "[w]eapon may be admitted." 384 S.W.3d at 123 (citing other cases, including *Sweatt v. Commonwealth,* 550 S.W.2d 520 (Ky. 1977)).

The connection in this case is admittedly attenuated. The unloaded 22 caliber rifles were found in Goben's storage locker at considerable remove from his apartment where investigators found the methamphetamine and the evidence of trafficking. In a somewhat different context—the application of sentencing guidelines—where courts must assess "whether a defendant possessed a firearm in connection with relevant drug activity," *Manigan,* 592 F.3d at 629, one factor bearing on the assessment

is the type of firearm involved. ("[A] drug trafficker is much more likely to utilize a handgun—as opposed to a rifle or long gun—due to size and concealability"). Another factor is the location or proximity of the firearm, with guns "readily accessible during drug activities" frequently deemed presumptively connected to that activity. *Id.*

Here, Detective Healy's testimony noting the commonness of a connection between drugs and the firearms possessed along with them was enough to establish the relevance of Goben's rifles for the purposes of KRE 401. However, potentially countervailing factors, such as the type of guns (rifles) and their location,[26] were pertinent to a KRE 403 analysis of whether relevant evidence should nevertheless be excluded because of "the danger of undue prejudice." *See* Robert G. Lawson, THE KENTUCKY EVIDENCE LAW HANDBOOK, § 6.15[5][a], p. 447 (5th ed. 2013) (citing *Daubert* and *Stringer v. Commonwealth,* 956 S.W.2d 883, 891 (Ky. 1997), as emphasizing the importance of KRE 403 (or its federal evidence rule counterpart) in conjunction with the rules allowing expert opinion evidence).

Here, of course, Goben did not invoke KRE 403, so the question before us is not whether the trial court somehow abused its discretion under that rule. The only question before us is whether the introduction of Goben's rifles was so at odds with the basic relevance rules as to amount to a palpable error under RCr 10.26, *i.e.,* whether plainly irrelevant rifle evidence rendered Goben's trial manifestly unjust either because that evidence clearly and improperly affected the result of the trial, or because it somehow otherwise undermined Goben's entitlement to due process of law. *Martin v. Commonwealth,* 207 S.W.3d 1, 3 (Ky. 2006).

The obvious answer is "no." On the contrary, as already discussed, the rifle evidence was relevant and its propriety under KRE 403 at worst uncertain, so its admission cannot be deemed a "palpable" error under RCr 10.26. And even if the evidence perhaps should have been excluded under KRE 403 if that objection had been raised, its admission did not render Goben's trial manifestly unjust. While the KRE 403 question would have been a close one, there was overwhelming evidence, aside from Goben's rifles, supporting both his convictions and his sentences. Thus, even if the rifle evidence was improper it did not taint the outcome and does not entitle Goben to RCr 10.26 relief.

**C. Given Goben's Prior Reference to it, The Commonwealth's Use During the Penalty Phase Of Goben's Not–Yet–Final October 2013 Conviction Did Not Amount to a Substantial Error.**

Goben's third and last allegation of evidentiary error concerns the Commonwealth's use during the penalty phase of the fact that Goben had just been convicted in October 2013 of manufacturing and trafficking in methamphetamine. At the time of Goben's September 2014 trial, Goben's direct appeal of the October 2013 judgment was still pending, and as he correctly notes, the general rule is that a not-yet-final prior conviction " 'may not be utilized under KRS 532.055 (the truth-in-

---

26. *See also Coleman v. State,* 145 S.W.3d 649, (Tex. Crim. App. 2004), noting, in the context of a firearm enhancement statute, such factors as "1) the type of gun involved; 2) whether or not the gun was loaded; 3) whether or not the gun was stolen; 4) the proximity of the gun to the drugs, drug paraphernalia, or drug manufacturing materials; 5) the accessibility of the gun to whomever controlled the premises; 6) the quantity of drugs involved; and 7) any evidence that might demonstrate an alternative purpose for the presence of the guns."). 145 S.W.3d at 659–60 (Cochran, J., concurring) (citations omitted).

sentencing statute) or under KRS 532.080 (persistent felony offender act).'" *Williams v. Commonwealth*, 178 S.W.3d 491, 499 (Ky. 2005) (quoting *Melson v. Commonwealth*, 772 S.W.2d 631 (Ky. 1989)). The circumstances here, though, make clear why the rule is "general" and not "absolute."

During its penalty-phase opening statement, the Commonwealth apprised the jury of Goben's rather lengthy criminal record (six prior felony offenses), and in particular of the two prior convictions upon which the Commonwealth relied in alleging that Goben should be sentenced as a first-degree persistent felon—one in 1996 for, among other charges, possession of a handgun by a convicted felon and two counts of trafficking in a controlled substance while in possession of a handgun; and another in 1988 (two years after Goben turned eighteen) for three counts of felony theft by unlawful taking. It was the Commonwealth's position that Goben merited a life sentence, not so much because he was violent and dangerous (although his record includes both a felony and a misdemeanor assault and gun crimes), but more because he was incorrigible. His record showed that since becoming an adult, Goben, upon release from prison for one offense, repeatedly and in short order reoffended. Indeed, his current crimes were committed less than two years after his release in February 2008 following a fifteen-year sentence on the 1996 convictions. The Commonwealth argued that while a life sentence would not prevent Goben's eventual release on parole, it would assure that, Goben would remain under the supervision of the Parole Board for the rest of his life. Significantly, the Commonwealth *never* referred in any way to Goben's December 2009 crimes or his conviction of them in October 2013.

In response, Goben's counsel noted during his opening statement that the forty-six year old Goben was currently serving a thirty-year sentence in another matter. Even the minimum allowable penalty in this case, counsel argued—a twenty-year sentence—would in essence leave Goben facing a fifty-year sentence. To someone Goben's age, as his counsel put it, that was definitely not "a slap on the wrist."

At the end of defense counsel's remarks, the Commonwealth asked to approach the bench, and noting the case law disallowing mention of Goben's not-yet-final October 2013 convictions, wondered how defense counsel's indirect mention of it by reference to the thirty-year sentence should be handled. The court ruled that Goben's bid for leniency in this case—and defense counsel acknowledged that that is exactly what it was—by asking the jury to take into account the fairly stiff sentence just received in the October 2013 case, opened the door to the October 2013 Judgment. The court then held that the Commonwealth could include those convictions on the list of Goben's prior convictions that it would show the jury.

Goben did not object to the court's ruling at the time, and the Commonwealth did introduce the fact that less than a year earlier Goben had been convicted of exactly the same two felonies of which he had just been convicted in this case. As noted above, the jury then recommended what the jury instructions indicated was the maximum possible sentence: life on the manufacturing charge (PFO enhanced) and twenty years on the trafficking charge (PFO enhanced) to be served consecutively.

A month later, at Goben's formal sentencing, however, defense counsel moved pursuant to Kentucky Rule of Civil Procedure (CR) 60 (presumably CR 60.02) for a new penalty-phase trial on the ground that

his reference to Goben's not-yet-final October 2013 conviction and sentence had been a mistake. Counsel portrayed it as a mistake made as a result of his having come into the case so late. The trial court, noting how involved Goben himself had been in his defense (implying that the leniency strategy, if not Goben's own idea, at least had his stamp of approval) and recalling that the defense strategy of appealing to the jury's leniency was both plausible and quite deliberate, rejected out of hand the claim of mistake and denied the motion.

Goben does not claim now that the trial court abused its discretion by denying his CR 60.02 motion.[27] Instead, much as he argued that the trial court erred by overreacting to its misreading of the indictment for subsequent-offense trafficking, he argues now that the trial court erred, palpably, by overreacting to Goben's penalty-phase opening statement and his reference therein to the no-yet-final October 2013 Judgment and its thirty-year sentence. With an abundance of hindsight, Goben maintains that counsel's reference to Goben's thirty-year sentence did not open the door fully to the October 2013 Judgment, but rather opened it only partially. He maintains it was opened enough for the Commonwealth to tell the jury that Goben had been convicted of *something* in October 2013 and sentenced as noted, but it was not opened enough for the Commonwealth to tell the jury that he had been convicted of the very crimes of which they had just convicted him again.

■■■ Had Goben made this argument to the trial court, and had the trial court rejected it, there might now be some merit to Goben's claim. We have explained that "opening the door"—a form of waiver deemed to arise "when one party's use of inadmissible evidence justifies the opposing party's rebuttal of that evidence with equally inadmissible proof," *Commonwealth v. Stone*, 291 S.W.3d 696, 702 (Ky. 2009) (citing *Purcell v. Commonwealth*, 149 S.W.3d 382, 399 (Ky. 2004))—depends on the context in which it occurs.

> The open door doctrine does not pave the way for responsive evidence just because it fits in the same general category as evidence already admitted.... The question in each case is not whether initial proof shares some common quality with proof offered in response. Rather, it is whether the latter answers the former, and whether it does so in a reasonable way without sacrifice of other important values.

*Id.* (citation and internal quotation marks omitted). Because Goben did not invoke this "reasonably answers" limitation on the opening-the-door doctrine, the question before us is not whether the trial court correctly applied that limitation. The question instead is whether the trial court's ruling was so clearly at odds with the doctrine and so clearly and unfairly detrimental to Goben as to be deemed a palpable error under RCr 10.26.

Once again, the answer is plainly "no." It is by no means clear, in the first place, that the trial court erred—Goben's improper use of his not-yet-final thirty-year sentence would hardly seem "answered" by mention of an unspecified conviction, since that much is already implicit in what defense counsel said. And even if the trial court erred by allowing too much detail in the "answer," the error cannot be said to have resulted in a manifest injustice. As

---

27. There is no surprise in this, since CR 60.02 provides, when appropriate, an avenue for relief from "excusable" negligence and mistakes. The failure, even by late-coming counsel, to realize that a client's most recent prior conviction is not yet final would have a hard time coming in under that standard. This fact is likely to have contributed to the skepticism with which the trial court regarded defense counsel's belated "mistake" claim.

noted, even before defense counsel brought the October 2013 Judgment into the picture, the Commonwealth had argued compellingly for the life sentence the jury imposed. While that might strike some as a harsh sentence, given Goben's long record and the Commonwealth's argument in favor of life-long parole supervision for a seemingly compulsive offender, one does not need Goben's October 2013 convictions to understand the jury's life sentence. Accordingly, there was no manifest injustice.

## V. The Judgment Should Clearly Reflect That Goben's Twenty–Year Sentence Runs Concurrently With His Life Sentence.

 Finally, as noted, the jury recommended that Goben's life sentence for methamphetamine manufacture be run consecutively with his twenty-year sentence for trafficking in that drug. We have held that pursuant to the sentencing statutes, KRS 532.110 and KRS 532.080, "no sentence can be ordered to run consecutively with a life sentence in any case." *Mabe v. Commonwealth,* 884 S.W.2d 668, 673 (Ky. 1994) (citing *Bedell v. Commonwealth,* 870 S.W.2d 779 (Ky. 1994)). The trial court appears to have tried to acknowledge both the jury's recommendation and the rule by providing in its final Judgment of Conviction and Sentence that Goben's two felony sentences would "run consecutively ... for a total sentence of LIFE in Prison." Although it is a technical point, we agree with Goben that the Judgment should be modified to clearly conform to the sentencing statutes, *i.e.,* the twenty-year sentence and life sentence must run concurrently.

## CONCLUSION

In sum, although significantly delayed by the prosecution of his December 2009 methamphetamine manufacturing and trafficking offenses, Goben's trial for his similar August 2009 offenses was not *unreasonably* delayed so as to violate his state and federal constitutional rights to a speedy trial. Nor was he denied his statutory right to a speedy trial after having a detainer lodged against him, since (assuming that a detainer was lodged) the trial court had good reason for missing the statutory deadline and missed it by only one month.

Nor is Goben entitled to a new trial. The suppression hearing evidence supported the trial court's conclusion that investigating officers made a valid warrantless entry of Goben's apartment under the emergency aid exception to the warrant requirement; a police detective's improper "investigative" hearsay testimony was rendered harmless in this case by the prior testimony and cross-examination of one of the two hearsay declarants; and the same detective's unobjected to testimony concerning two rifles found in Goben's storage locker and the introduction of the rifles into evidence, even if error was not palpable where the unquestionably proper evidence against Goben was such as to make the rifle evidence cumulative. Finally, the unobjected to introduction, during the penalty phase, of Goben's not-yet-final October 2013 convictions for manufacturing and trafficking in methamphetamine was not a manifestly unjust response to Goben's own use of the 2013 Judgment—his reference to his thirty-year sentence in that case supporting imposition of a minimum sentence in this one. Accordingly, we hereby affirm the Judgment of the Jefferson Circuit Court, but remand to that court for entry of a Judgment amended to clarify that Goben's twenty-year sentence is to run concurrently with his sentence for life.

All sitting. All concur.