RENDERED:  JANUARY 8, 2021; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2019-CA-1402-MR

STEVEN LOGAN                                                                          APPELLANT

v.

APPEAL FROM FAYETTE CIRCUIT COURT
HONORABLE JOHN E. REYNOLDS, JUDGE
ACTION NO. 18-CR-00939

COMMONWEALTH OF KENTUCKY                                                APPELLEE

OPINION
AFFIRMING

** ** ** ** **

BEFORE:  CLAYTON, CHIEF JUDGE; DIXON AND JONES, JUDGES.

JONES, JUDGE:  In June of 2018, the Appellant, Steven Logan, was tried before a

Fayette Circuit Court jury on charges of burglary in the first degree,[1] intimidating a

participant in the legal process,[2] criminal mischief in the third degree,[3] and

---

[1] Kentucky Revised Statutes ("KRS") 511.020.

[2] KRS 524.040.

[3] KRS 512.040.

terroristic threatening in the third degree.[4]  The jury returned a verdict of guilty on all charges and recommended a total sentence of eighteen years.  The trial court entered a final judgment and sentence of imprisonment consistent with the jury's verdicts and recommendation from which Logan now appeals as matter of right.  Having reviewed the record, and being otherwise sufficiently advised, we affirm.

## I. BACKGROUND

The charges at issue arose out of an incident that occurred between Logan and Chereva Wallace on June 23, 2018.  On that date, Wallace was living at an apartment in Lexington, Kentucky, with her three children, one of whom belonged to Logan.  Wallace testified that she would occasionally allow Logan to stay at the apartment to visit their child, but he had a residence elsewhere where he kept his belongings.  Logan was dropped off at Wallace's apartment on the afternoon of June 23, 2018.  Wallace met Logan on the back porch where he asked to use her cellphone.  Wallace gave Logan her phone and returned to the inside of her apartment to tend to the children.

While Wallace was still inside the apartment, Logan starting walking away from the apartment toward the liquor store with Wallace's cellphone in tow.  When Wallace realized Logan was leaving the premises with her phone, she asked a neighbor to watch the children and followed Logan to the liquor store.  Once

---

[4] KRS 508.080.

-2-

Wallace caught up with Logan, she demanded Logan return her phone. Logan then accused Wallace of spending $80.00 he gave to her for their child on her boyfriend; Logan refused to give the phone back until Wallace repaid him the $80.00.

The two cursed and argued with one another about the phone and the money. Eventually, Wallace grabbed her phone from Logan and ran back toward her apartment with Logan in pursuit. When Wallace got back to her apartment, she locked all the doors, took her children inside a bathroom with her, and locked the bathroom door behind them. From the inside of the bathroom, Wallace heard Logan enter the apartment. She believed he accomplished entry by yanking at the sliding glass door.

Once Wallace ascertained that Logan was inside the apartment, she cracked the bathroom door slightly and peered through the crack. She saw that Logan was wielding a knife and closed the door. Logan made his way to the bathroom door and began beating and kicking at the door. While Logan was trying to beat down the bathroom door, Wallace called 911 and requested police assistance.[5] At some point, Logan finally gained entry to the bathroom. Around

---

[5] The 911 call was played for the jury during Logan's trial. Wallace can be heard on the call telling the operator that "[her] baby daddy is trying to kick the door down" and screaming at Logan, "The baby is right here! You can kill the baby!" Logan can be heard cursing and screaming threats at Wallace.

the same time, Wallace heard police sirens wailing in the distance. At this point, Logan grabbed Wallace's cell phone and left the apartment.

In addition to Wallace, the Commonwealth called the three Lexington police officers who responded to the scene to testify on its behalf at Logan's trial: Officers Alexander Childers, Christopher Johnson, and Hunter Wilks.[6] When the officers arrived on the scene, they located Logan outside of Wallace's apartment complex. During his encounter with police, Logan admitted gaining entry to Wallace's apartment through the sliding glass door and busting through the bathroom door. He told the officers that he took Wallace's cellphone when he left the apartment because he did not want Wallace to be able to call the police. He also told the officers that he did not live with Wallace and that he had his own place. The officers testified that a knife and Wallace's phone were found in Logan's back pocket.

Logan was placed under arrest by the officers and transported to the Fayette County Detention Center for booking. When the officers attempted to remove Logan from the police cruiser at the Detention Center, he tried to headbutt Officer Wilks.

---

[6] The officers were equipped with body cameras and the footage was played for the jury as part of the officers' testimony.

The Commonwealth's last witness during the guilt phase was Stephanie Ball, a supervisor for the Fayette County Circuit Clerk. During Ball's testimony, the Commonwealth introduced a video of Logan in court approximately one week before his trial. During that proceeding, Logan told the court: "I'm guilty for what I did, but this whole thing has blown up."

Following the conclusion of the Commonwealth's case-in-chief, Logan moved for directed verdict on the first-degree burglary charge. The trial court denied this motion, and turned the case over to Logan. Logan's only witness was his mother, Tommie Carter.[7] Carter testified that Logan was basically living at Wallace's apartment at the time of the incident.

Following deliberation, the jury found Logan guilty of burglary in the first degree, intimidating a participant in the legal process, criminal mischief in the third degree, and terroristic threatening in the third degree. The trial then proceeded to the penalty phase. During the penalty phase, Logan asserted that the Commonwealth had misled the jury by manipulating the body camera footage. To rebut this claim, the Commonwealth was allowed to show that it had edited the footage only for the purpose of removing portions of the footage where there were discussions of Logan being on diversion for a prior charge at the time of his arrest.

---

[7] The Commonwealth spelled Ms. Carter's first name as "Tommy" in its appellate brief. The record, however, contains a letter from Ms. Carter that confirms she spells her first name as "Tommie," so that is spelling we have adopted herein.

Ultimately, the jury recommended a total sentence of eighteen years. The trial court sentenced Logan in accordance with the jury's recommendation.

This appeal followed.

## II. ANALYSIS

Logan presents three separate assignments of error for our consideration: 1) he argues that the Commonwealth did not prove all of the elements necessary to sustain a conviction for burglary in the first degree; 2) he argues that the Commonwealth's failure to present sufficient evidence to support a conviction for intimidating a witness amounts to palpable error; and 3) he argues that the Commonwealth improperly elicited testimony from him during the penalty phase about a prior rape charge that was ultimately amended down to an unlawful transaction with a minor and diverted for ten years. We address each argument below.

### A. Burglary in the First Degree

The proper standard of review on a motion for a directed verdict is stated in *Commonwealth v. Benham*, 816 S.W.2d 186 (Ky. 1991), as follows:

> On motion for directed verdict, the trial court must draw all fair and reasonable inferences from the evidence in favor of the Commonwealth. If the evidence is sufficient to induce a reasonable juror to believe beyond a reasonable doubt that the defendant is guilty, a directed verdict should not be given. For the purpose of ruling on the motion, the trial court must assume that the evidence for the Commonwealth is true, but reserving to the jury

questions as to the credibility and weight to be given to such testimony.

*Id.* at 187.

"On appellate review, the test of a directed verdict is, if under the evidence as a whole, it would be clearly unreasonable for a jury to find guilt, only then the defendant is entitled to a directed verdict of acquittal." *Baker v. Commonwealth*, 545 S.W.3d 267, 278 (Ky. 2018) (quoting *Commonwealth v. Sawhill*, 660 S.W.2d 3, 5 (Ky. 1983)).

Pursuant to KRS 511.020,

(1) A person is guilty of burglary in the first degree when, with the intent to commit a crime, he knowingly enters or remains unlawfully in a building, and when in effecting entry or while in the building or in the immediate flight therefrom, he or another participant in the crime:

(a) Is armed with explosives or a deadly weapon; or

(b) Causes physical injury to any person who is not a participant in the crime; or

(c) Uses or threatens the use of a dangerous instrument against any person who is not a participant in the crime.

Logan asserts the Commonwealth did not present sufficient evidence to establish that he unlawfully entered or remained in Wallace's apartment. Logan explains that he was privileged to enter the apartment because Wallace periodically

-7-

allowed him to stay at the apartment. Logan also points out that on the day in question, Wallace never explicitly told Logan that he was not welcome to enter her apartment.

To support his position, Logan relies heavily on *Lewis v. Commonwealth*, 392 S.W.3d 917, 920 (Ky. 2013). In *Lewis*, the Kentucky Supreme Court held that the trial court erred when it denied a motion for a directed verdict on first-degree burglary because there was no evidence that Lewis's license to be in the premises had been expressly communicated to him. In *Lewis*, however, the building in question was a pharmacy, which was open to the public. KRS 511.090(2) specifically instructs that "[a] person who, regardless of his intent, enters or remains in or upon premises which are at the time open to the public does so with license or privilege unless he defies a lawful order not to enter or remain personally communicated to him by the owner of such premises or other authorized person." This case involves a private residence that was not held open to the public, making the portions of *Lewis* relied upon by Logan largely inapposite.

The privilege to enter or remain in a private dwelling can be "revoked by conduct other [than] express words[.]" *Hedges v. Commonwealth*, 937 S.W.2d 703, 706 (Ky. 1996). While it is true that Wallace never explicitly told Logan that he was not welcome in her apartment, the evidence was sufficient to demonstrate

that Wallace's actions of locking the doors behind her and not voluntarily unlocking them when Wallace attempted entry were sufficient to demonstrate that Logan was not welcome in her apartment on the afternoon in question. In fact, the evidence suggested that Logan forced his way into the apartment. The sliding glass door had been knocked off its track and that door was still in the locked position when police examined it.

Based on the evidence presented by the Commonwealth, it would not have been unreasonable for the jury to find that Logan unlawfully entered Wallace's apartment; therefore, we conclude that the trial court properly denied Logan's motion for a directed verdict and submitted the count of burglary in the first degree to the jury. *See Daugherty v. Commonwealth*, 572 S.W.2d 861, 862 (Ky. 1978) (holding that the trial court properly denied defendant's motion for a directed verdict on a burglary count even where the evidence was equivocal as to whether the defendant had permission to be in his sister's apartment because whether he had such permission, "he certainly did not have the owners' consent to gain entry by breaking a window").

### B. Intimidating a Participant in the Legal Process

Logan's next argument is that the Commonwealth presented insufficient evidence to support a conviction for intimidating a participant in the

legal process. Logan concedes that he did not preserve this argument by making a motion for a directed verdict on this count.

This Court reviews unpreserved claims of error on direct appeal only for palpable error. To prevail, one must show that the error resulted in "manifest injustice." RCr[8] 10.26 provides:

> A palpable error which affects the substantial rights of a party may be considered . . . by an appellate court on appeal, even though insufficiently raised or preserved for review, and appropriate relief may be granted upon a determination that manifest injustice has resulted from the error.

"The required showing is probability of a different result or error so fundamental as to threaten a defendant's entitlement to due process of law." *Martin v. Commonwealth*, 207 S.W.3d 1, 3 (Ky. 2006). The Commonwealth's failure to produce evidence sufficient to establish all elements of the charged crime can rise to the level of palpable error. *See Commonwealth v. Jones*, 283 S.W.3d 665, 670 (Ky. 2009).

Pursuant to KRS 524.040,

> (1) A person is guilty of intimidating a participant in the legal process when, by use of physical force or a threat directed to a person he believes to be a participant in the legal process, he or she:
>
>  . . .

---

[8] Kentucky Rules of Criminal Procedure.

(f) Hinders, delays, or prevents the communication to a law enforcement officer or judge of information relating to the possible commission of an offense or a violation of conditions of probation, parole or release pending judicial proceedings.

The Commonwealth argues that Wallace's testimony that Logan took her phone from her when he left the apartment, coupled with his statement to the investigating officers that he did so to prevent Wallace from calling the police, is sufficient to establish the elements necessary to prove that Logan hindered, delayed, or prevented Wallace from further communicating with police about the possible commission of an offense. Logan, however, asserts that because Wallace had already successfully placed a call to 911 and police were en route to the apartment, his actions did not actually hinder any communication with law enforcement.

We considered a similar case in *Jackson v. Commonwealth*, 487 S.W.3d 921, 925 (Ky. App. 2016). In *Jackson*, the victim successfully used her neighbor's telephone to contact 911; however, before the call was completed the defendant took the phone and threw it. After the victim's neighbor put the phone back together, the 911 operator called back to complete the call. Like Logan, the defendant argued that the Commonwealth failed to establish that he had actually hindered or delayed the victim's attempt to contact law enforcement. We disagreed holding that no palpable error occurred because even though "the

-11-

neighbor testified that she was able to put the phone back together and use it again, it was well within the jury's fact-finding role to determine whether this hindered or delayed [the victim's] ability to communicate with the police in order to report the incident." *Id.* at 929.

In this case, Wallace unilaterally ended the 911 call before police arrived. She testified that she felt afraid to be on the phone with Logan in the apartment. And, police had not yet arrived inside the apartment when Logan took Wallace's phone from her. Certainly, the jury could have inferred that had Logan not taken Wallace's phone with him when he exited the apartment, either Wallace or the 911 operator would have reinitiated the call. Therefore, we conclude Logan failed to demonstrate any palpable error with respect to the charge of intimidating a participant in the legal process.

## C. Penalty Phase Evidence

Logan's final assignment of error is that the trial court impermissibly allowed the Commonwealth to introduce evidence the he had been charged with rape in the past. Logan claims this was in error because he was never actually convicted of rape; the rape charge was amended to a charge of an unlawful transaction with a minor and diverted for ten years.

The Commonwealth did not illicit any testimony about the rape charge during its penalty phase case-in-chief. Its proof during the penalty phase

-12-

consisted of introducing Logan's prior convictions through the use of certified records that were read into the record. The prior convictions were read by stating the county, date of the final judgment, and the sentence. The diverted charge was not included.

However, Logan testified on his own behalf during the penalty phase. During this testimony Logan denied having committed the crimes in question and accused the prosecution of tampering with the evidence to prevent the jury from learning the full truth. Referring to the body camera video played to the jury during the guilt phase, Logan testified:

> She stood right there and lied to you guys the whole time and they played the evidence that was clipped up. They didn't want you to see the entirety of this whole situation. They did not want that because this case wouldn't have made it past the Grand Jury.

Following this testimony, the Commonwealth sought to cross-examine Logan on the redacted portions of the body camera footage. Logan objected on the basis that the redacted portions of the video contained statements he made about being on diversion. The trial court allowed the questioning.

Thereafter, the Commonwealth proceeded to question Logan about the omitted portions of the body camera footage. The Commonwealth first asked Logan if the omitted portions of the footage contained a lot of references Logan had made about the fact that he was on diversion/probation for a charge that the

Commonwealth did not read to the jury. Logan stated that he did not remember and then told the Commonwealth not to "beat around the bush" anymore and that the prosecutor should just "speak exactly what [was] on [her] mind." Following a bench conference at which Logan's counsel objected to further inquiry, the trial court ruled that the Commonwealth could proceed with its questioning because Logan had opened the door to further inquiry by the Commonwealth when he insinuated the Commonwealth altered the body camera footage for its own benefit.

The Commonwealth then resumed questioning Logan. The Commonwealth once again tried to get Logan to admit that he had been charged with an offense in 2017 that was not previously read to the jury without mentioning the specific charge. Logan responded that he did not know what the Commonwealth was talking about. The Commonwealth again tried to get Logan to admit that there was a diverted charge that was not previously read to the jury. Logan again stated that he did not know what the Commonwealth was talking about. On her third attempt, the prosecutor asked Logan directly whether he was charged with rape in the second degree in 2017. No objection was lodged by Logan's counsel, and Logan answered that he was charged with rape in the second degree in 2017. The prosecutor then asked Logan if the charge was diverted for ten years and whether that was what Logan was referring to in the redacted portions of the body camera footage. Logan was once again rather evasive. The

prosecutor, while still being vague, rephrased her question again. Logan gave largely nonresponsive answers in which he denied committing the burglary at issue. He then admitted to being charged with rape. The prosecutor then asked Logan if the rape charge was amended to a charge of an unlawful transaction with a minor to which Logan pled guilty leading to the diversion referenced in the redacted body camera footage. Logan simply responded, "I don't know."

Having reviewed the record, we must conclude that the trial court correctly allowed the prosecutor to question Logan about the omitted portions of the body camera footage because Logan insinuated that the Commonwealth had redacted the footage for its benefit. This allowed the Commonwealth some leeway in proving what the omitted portions contained. To do so, the Commonwealth had to provide the jury with an understanding of what was omitted. It is clear to us that the Commonwealth attempted to do so without mentioning the specific charge that led to the diversion. However, Logan doggedly denied knowing whether he was charged with an offense in 2017. This required the Commonwealth to be more specific. While the Commonwealth could have referenced only the unlawful transaction with a minor charge instead of the rape charge, we note that Logan's counsel did not object or otherwise request an explanatory admonition. In any event, through the testimony, the jury learned that Logan had only pleaded guilty to an unlawful transaction with a minor charge, not a rape charge, and that the

amended charge was diverted for ten years, which was what Logan was discussing with the police officers in the omitted portions of the body camera footage.

Based on the facts, we do not believe the Commonwealth's act of questioning Logan about the rape charge resulted in manifest injustice. Logan opened the door to further questions and his evasive answers to the Commonwealth's questions necessitated mentioning the specific charges. Moreover, we note that the jury did not recommend the maximum sentence and sufficient proof was introduced that Logan had numerous prior convictions. *See Goben v. Commonwealth*, 503 S.W.3d 890, 923 (Ky. 2016).

### III. CONCLUSION

Finding no error, we affirm the conviction of the Fayette Circuit Court.

ALL CONCUR.

BRIEFS FOR APPELLANT:

Adam Meyer
Frankfort, Kentucky

BRIEF FOR APPELLEE:

Daniel Cameron
Attorney General of Kentucky

Aspen Roberts
Assistant Attorney General
Frankfort, Kentucky